Paul REGISTER *v.* OAKLAWN JOCKEY CLUB, INC.,
and American Totalisator Co., Inc.

90-302 811 S.W.2d 315

Supreme Court of Arkansas
Opinion delivered July 15, 1991
[Supplemental Opinion on Rehearing December 23, 1991.]

*Carl A. Crow, Jr.*, for appellant.

*Friday, Eldredge & Clark*, by: *James M. Simpson*, for appellee Oaklawn Jockey Club, Inc.

*Daily, West, Core, Coffman & Canfield*, by: *Michael C. Carter* and *Janice West Whitt*, for American Totalisator Co., Inc.

JACK HOLT, JR., Chief Justice. The issue in this case is whether the appellees, Oaklawn Jockey Club, Inc. (Oaklawn) and American Totalisator Co., Inc. (Amtote), owed any duty to the appellant, Paul Register, the breach of which would give rise to a tort action for negligent conduct on their part.

On February 10, 1989, Mr. Register attempted to place a Classix wager, where the bettor correctly selects the winning horse in six consecutive races, at Oaklawn Park in Hot Springs. When Mr. Register attempted to place his bet, the Amtote machine failed to issue a ticket conforming to his designated selections. Upon inquiry, Mr. Register was erroneously advised by Oaklawn's ticketing clerk that one of the horses he had selected had been withdrawn from its race. Mr. Register subsequently chose another horse and made his bet. At the conclusion of the six races, Mr. Register had correctly selected five winning horses. Apparently, though, the horse that Mr. Register had been told had been withdrawn had not been "scratched" and was in fact the winner of its race. Had Mr. Register's original wager been accepted, he would have been the holder of a winning ticket to a major share in the Classix.

The "Major Share" of the Classix pool (75% of the net amount in the pool) that day was $56,165.40, which was paid to the holder of one winning ticket issued for that wager. Mr. Register filed suit to recover one-half of that amount, $28,082.70. The trial court granted the appellees' motion for summary judgment, and Mr. Register appeals and alleges that the trial court erred in granting the summary judgment on the following bases: 1) Oaklawn and Amtote owed him a duty to use ordinary care, 2) Oaklawn and Amtote owed him a contractual duty on theories of implied contract, quasi-contract, and third party beneficiary, and 3) his cause of action is not barred by the Arkansas State Racing Commission Rules.

█ We find that the appellees owed a duty to Mr. Register, and it was error for the trial court to grant summary judgment in light of the alleged negligence of Oaklawn and Amtote by Mr. Register. Accordingly, the judgment is reversed and remanded.

In *Rickenbacker* v. *Wal-Mart Stores*, Inc., 302 Ark. 119, 788 S.W.2d 474 (1990), we noted that Ark. R. Civ. P. 56 provides that summary judgment is appropriate where the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact. On appeal, in determining whether there is an issue of fact, the proof is viewed most favorably to the party resisting the motion, with all doubts and inferences resolved

against the moving party. The burden of proving that there is no genuine issue of material fact rests with the party moving for summary judgment.

In order to make a prima facie case of negligence, a plaintiff must show that he sustained damages, that the defendant was negligent, and that such negligence was the proximate cause of the damages. To prove negligence, a party must show that the defendant has failed to use the care that a reasonably careful person would use under circumstances similar to those shown by the evidence in the case. *Earnest* v. *Joe Works Chevrolet, Inc.*, 295 Ark. 90, 746 S.W.2d 554 (1988). Further, a party may establish negligence by direct or circumstantial evidence, but he cannot rely upon inferences based on conjecture or speculation. *Earnest* v. *Joe Works Chevrolet, Inc., supra*, (citing *Glidewell Adm.* v. *Arkhola Sand and Gravel Co.*, 212 Ark. 838, 208 S.W.2d 4 (1948)).

Mr. Register contends in his first point of error that Oaklawn and Amtote owed him a duty to use ordinary care in responding to his specific requests for a wager. The existence of a duty depends upon whether a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other. W. Keeton, *Prosser and Keeton on Torts* 235 (5th ed. 1983). Under our well-established principles of common law duty and the facts before us, we find that a duty existed between the appellees and Mr. Register. Whether this duty was breached in this case is a genuine issue of material fact that would preclude the granting of summary judgment.

Oaklawn and Amtote's reliance on cases decided in other jurisdictions is misplaced in that those cases generally had statutes or rules and regulations limiting tort liability or dealt with the contractual theory of liability. *See Bourgeois* v. *Fairground Corp.*, 480 So. 2d 408 (La. App. 1985); *Seder* v. *Arlington Park Race Track Corp.*, 481 N.E.2d 9 (Ill. App. 1985); *Valois* v. *Gulf Stream Racing Ass'n*, 412 So.2d 959 (Fla. App. 1982); *Hochberg* v. *New York City Off-Track Betting Corp.*, 343 N.Y.S.2d 651 (1973), *aff'd* 352 N.Y.S.2d 423 (1974); *Holberg* v. *Westchester Racing Ass'n*, 53 N.Y.S.2d 490 (1945). In Arkansas, there is no statute, rule, or regulation that limits or restricts civil liability for negligence under these circumstances.

*Cf.* Ark. Code Ann. § 23-110-406 (1987) (contractual liability limitation.)

In addressing Mr. Register's second point of error, that Oaklawn and Amtote owed him a contractual duty on theories of implied contract, quasi-contract, and third party beneficiary, we note that horse racing in our state is authorized and regulated pursuant to the Arkansas Horse Racing Law (Law), codified at Ark. Code Ann. §§ 23-110-101 to -415 (1987 and Supp. 1989). The Law specifically provides that the only legislatively authorized way for a patron at a race track to recover money based upon the outcome of a horse race is through pari-mutuel or certificate system of wagering. Section 23-110-102. Any wagering contract on horse races outside of the scope of the Law is therefore invalid and illegal. Section 23-110-405(d)(2).

In fact, the Law prescribes that money in the betting pool "shall be paid over to bettors holding winning pari-mutuel tickets . . . ." Section 23-110-406(a). In *Holberg* v. *Westchester Racing Ass'n, supra,* the court reasoned that "[t]here can be no valid pari-mutuel bet or wager independent of a pari-mutuel ticket. The ticket not only is essential but is the contract itself." We find this rationale persuasive.

█ Consequently, as Mr. Register makes no claim to having a winning ticket representing entitlement to a major share in the Classix pool, there can be no recovery sounding in contract.

█ Finally, Mr. Register argues that his cause of action is not barred by the Arkansas State Racing Commission Rules. However, these rules have not been included in the abstract, and we are unable to address the issue. *Burgess* v. *Burgess,* 286 Ark. 497, 696 S.W.2d 312 (1985).

Reversed and remanded.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING
DECEMBER 23, 1991

821 S.W.2d 475

*Carl A. Crow, Jr.*, for appellant.

*Janis Whitt* and *James Simpson*, for appellee.

ROBERT H. DUDLEY, Justice. We grant rehearing in this case and affirm the ruling of the trial court. The facts were accurately set out in the original opinion, *Register* v. *Oaklawn Jockey Club, Inc.*, 306 Ark. 318, 319, 811 S.W.2d 315, 316 (1991) as follows:

On February 10, 1989, Mr. Register attempted to place a Classix wager, where the bettor correctly selects the winning horse in six consecutive races, at Oaklawn Park in Hot Springs. When Mr. Register attempted to place his bet, the Amtote machine failed to issue a ticket conforming to his designated selections. Upon inquiry, Mr. Register was erroneously advised by Oaklawn's ticketing clerk that one of the horses he had selected had been withdrawn from its race. Mr. Register subsequently chose another horse and made his bet. At the conclusion of the six races, Mr. Register had correctly selected five winning horses. Apparently, though, the horse that Mr. Register had been told had been withdrawn had not been "scratched" and was in fact the winner of its race. Had Mr. Register's original wager been accepted, he would have been the holder of a winning ticket to a major share in the Classix.

The "Major Share" of the Classix pool (75% of the net amount in the pool) that day was $56,165.40, which was paid to the holder of one winning ticket issued for that wager. Mr. Register filed suit to recover one-half of that amount, $28,082.70. The trial court granted the appellees' motion for summary judgment, and Mr. Register appeals and alleges that the trial court erred in granting the summary judgment on the following bases: 1) Oaklawn and Amtote owed him a duty to use ordinary care, 2) Oaklawn and Amtote owed him a contractual duty on theories of implied contract, quasi-contract, and third party beneficiary, and 3) his cause of action is not barred by the Arkansas State Racing Commission Rules.

We affirmed the trial court's granting of summary judgment on the counts of implied contract, quasi-contract, and third party beneficiary, but reversed the trial court's granting of summary judgment on the count alleging negligence. We held that Oaklawn and Amtote owed Mr. Register a duty to use ordinary care in taking his bet and, as a result, Mr. Register had stated a cause of action sounding in tort.

■ After reading the briefs submitted to us on the petition for rehearing, we have concluded that we erred in reversing the trial court on the negligence count. That error came about in the following way. The trial court held that statutes and regulations of the Arkansas State Racing Commission barred the negligence count. Mr. Register, in his original appellant's brief, argued that the regulations did not bar the negligence claim, but he failed to abstact the regulations. Both Oaklawn and Amtote cited the statutes and quoted the regulations in the argument part of their original appellees' briefs but, even so, we refused to consider them because appellant Register had not abstracted them. That was error on our part. We should have considered the regulations for either of two reasons. First, they were set out in the appellees' brief, and second, courts take judicial notice of regulations of state agencies which are duly published. *Webb* v. *Bishop*, 242 Ark. 320, 413 S.W.2d 862 (1967). Unfortunately, we held: "Finally, Mr. Register argues that his cause of action is not barred by the Arkansas State Racing Commission Rules. However, these rules have not been included in the abstract, and we are unable to address the issue." *Register* v. *Oaklawn Jockey Club, Inc.*, 306 Ark. at 321, 811 S.W.2d at 317-18 (citing *Burgess* v. *Burgess*, 286 Ark. 497, 696 S.W.2d 312 (1985)). Then, instead of affirming the trial court's holding that the statutes and regulations barred the negligence claim, we held that the trial court erred and that Mr. Register had stated a common law claim on that one count. Once the statutes and regulations on the negligence count are considered, it becomes apparent that the trial court ruled correctly, and we are the court that erred. Accordingly, we grant rehearing, modify the original opinion, and now affirm the trial court on the negligence count.

In earlier times all gaming contracts were against the public policy of this State. Our public policy was strong, so strong that since the Revised Statutes of 1838, we have had a statute that provides a losing bettor can maintain a suit to recover his losses, but a winning bettor may not do likewise because his contract is void. Ark. Code Ann. § 16-118-103(a) and (b)(1) (1987). In construing this statute we held that it meant that a winning wager on a horse race is illegal and void. *McLain* v. *Huffman*, 30 Ark.

428 (1875). Since a winning wager was illegal and void, there was no common law duty of care owed to a person making a wager.

Our law so continued until 1956, when the voters of Arkansas adopted the 46th Amendment to the Constitution of Arkansas which provides: "Horse racing and pari-mutuel wagering thereon shall be lawful in Hot Springs, Garland County, Arkansas, and *shall be regulated by the General Assembly.*" (Emphasis added.) The General Assembly has now regulated pari-mutuel wagering and has expressly provided for the disposition of wagering money as follows:

> Excepting only the moneys retained for the use and benefit of the franchise holder, the amounts paid to the commission for the use and benefit of the State of Arkansas, the amount paid to the commission for deposit in the Arkansas Racing Commission Purse and Awards Fund, and the amount paid to a city, town, or county as provided in this subchapter, *all moneys received by the franchise holder from wagers pursuant to this subchapter shall be paid over to bettors holding winning pari-mutuel tickets* in accordance with the provisions and at those times specified in the various race programs written by the franchise holder for the racing meet, as their respective interests may appear, *upon presentation of the tickets.* [Emphasis added.]

Ark. Code Ann. § 23-110-406(a) (1987). The meaning of the statute is clear. All wagering money received by Oaklawn shall be paid over to bettors holding winning tickets.

In addition, Ark. Code Ann. § 23-110-405(d)(2) (1987), in pertinent part provides, "There shall be no wagering on the results of any races except under the pari-mutuel or certificate method of wagering as provided for in this section . . . ." Again, it is clear that the General Assembly intends for all money received from wagers to be paid over to the bettors, subject to the other provisions of the statute.

Rule 2416 of the Arkansas State Racing Commission Rules and Regulations Governing Horse Racing in Arkansas (1989), provides:

Any claim by a person that a wrong ticket has been delivered to him must be made before leaving the mutuel ticket window. No claims shall be considered thereafter and no claim shall be considered for tickets thrown away, lost, changed, destroyed or mutilated beyond identification. *Payment of wagers will be made only on presentation of appropriate pari-mutuel tickets.* [Emphasis added.]

Classix wagers are governed by Rule 2460(D) as follows:

(1) The net amount in the Classix pari-mutuel pool will be divided into the Major Share (75%) and the Minor (Consolation) Share (25%).

(a) The Major Share (75%) will be distributed among the *holders of Classix tickets which correctly designate the official winner in each of the six races comprising the Classix.*

(b) The Minor Share (25%) will be distributed among the *holders of the Classix tickets which correctly designate the most official winners, but fewer than six, of the six races comprising the Classix.* [Emphasis added.]

 In summary, pari-mutuel wagering is now authorized by the Constitution of the State of Arkansas and "shall be regulated by the General Assembly." The General Assembly has enacted statutes heavily regulating such wagering, has created the Arkansas State Racing Commission, and has authorized it to promulgate rules and regulations. That Commission has promulgated rules and regulations concerning Classix wagering. Under the statutes and regulations, a bettor must hold a pari-mutuel ticket that correctly designates the winner of all six races in order to receive any money from the Classix Major Share Pool.

All other jurisdictions that have considered similar statutes and regulations have concluded that common law negligence claims such as the one now before us are barred. *Bourgeois* v.

*Fairground Corp.*, 480 So.2d 408 (La. App. 1985); *Seder* v. *Arlington Park Race Track Corp.*, 481 N.E.2d 9 (Ill. App. 1985); *Valois* v. *Gulfstream Park Racing Ass'n*, 412 So.2d 959 (Fla. App. 1982); *Hochberg* v. *New York City Off-Track Betting Corp.*, 343 N.Y.S.2d 651 (1973), *aff'd*, 352 N.Y.S.2d 423 (1974).

In holding no liability on a negligence claim in a case almost identical to the one at bar, the court, in *Seder* v. *Arlington Park Race Track Corp.*, 481 N.E.2d 9, 11-12 (Ill. App. 1985), relied on a comparable statute and wrote:

> [T]he only legislatively authorized way for a patron at a racetrack to recover money based upon the outcome of a horse race is through the pari-mutuel or certificate system. (Ill. Rev. Stat. 1983, ch. 8, pars. 37-26.) . . . The Act also establishes a board to supervise the pari-mutuel system and to prescribe rules, regulations and conditions governing the conduct of the races. *Under the rules and regulations adopted by the board, it is clear that in order to receive any funds from the sweep six wagering pool, a patron must hold a pari-mutuel ticket which correctly designates the winner of the six races.* See Illinois Racing Board Rules B5.14, B17.3.

In *Valois* v. *Gulfstream Park Racing Ass'n*, 412 So.2d 959, 960 (Fla. App. 1982), in affirming the dismissal of a complaint which included a negligence count, the court cited the applicable regulation that provided, "[p]ayment of winning pari-mutuel tickets shall be made only upon presentation and surrender of such tickets. No claims shall be allowed for lost or destroyed winning tickets." It additionally cited, but did not apply, a statute enacted after the occurrence of the alleged negligent act as expressing the public policy of the state that there should be no recovery for such a claim.

In *Hochberg* v. *New York Off-Track Betting Corp.* 343 N.Y.S.2d 651, 656 (1973), the court held, "Defendant, in this case, owes no duty to the plaintiff or any other OTB [New York

City Off-Track Betting Corporation] bettor with respect to the accuracy of the information and neither plaintiff nor any other bettor is entitled to rely on the information and hold defendant liable for any mistakes therein." In so holding the court relied on a statute which provided that "all sums deposited in any off-track pari-mutuel pools shall be distributed to the holders of winning tickets therein. . . ." *Id.* at 655.

 In conclusion, we erred in not considering the statutes and regulations in our original opinion. Upon considering them we now hold, as have all other jurisdictions having similar statutes and regulations, that without the presentation of a winning Classix ticket, a bettor is precluded from asserting a claim sounding in either tort or contract. Accordingly, rehearing is granted, the original opinion of this court is modified, and the decision of the trial court is affirmed.

HOLT, C.J., GLAZE and CORBIN, JJ., dissenting.

JACK HOLT, JR., Chief Justice, dissenting. The petitioner, American Totalisator Co., Inc. (Amtote), submits its petition for rehearing on the basis that this court should reconsider its analysis of the decisions of courts in other jurisdictions. Amtote makes two assertions: 1) the other courts relied on statutes or rules and regulations virtually identical to those in effect in Arkansas, and 2) the plaintiff in every one of the five cited cases attempted to recover on a negligence theory, as well as a contract theory, and the negligence claim was rejected in each case.

Arkansas Sup. Ct. R. 20(g) states as follows:

> The petition for rehearing should be used to call attention to specific errors of law or fact which the opinion is thought to contain. Counsel are expected to argue the case fully in the original briefs, and the brief on rehearing is not intended to afford an opportunity for a mere repetition of the argument alrady considered by the court.

Amtote essentially requests that this court reassess its analysis of the decisions of courts in other jurisdictions. In its

opinion of July 15, 1991, this court stated, "The existence of a duty depends upon whether a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other. Under our well-established principles of common law duty and the facts before us, we find that a duty existed between the appellees and Mr. Register."

In addressing the parties' arguments on appeal, this court also noted that "Oaklawn and Amtote's reliance on cases decided in other jurisdictions is misplaced in that those cases *generally* had statutes or rules and regulations limiting tort liability or dealt with the contractual theory of liability." (Emphasis added.)

Given the court's phrasing in finding a duty owed by Amtote to Mr. Register, and analysis of the decisions of other jurisdictions, it is apparent to the dissent that this court addressed Amtote's extensive appellate arguments.

In our previous opinion, we declined to reach Mr. Register's final argument that his cause of action was not barred by the Arkansas State Racing Commission Rules inasmuch as he had failed to abstract them and noted that Amtote likewise had failed to properly supplement the abstract with the rules. Granted, we were partially wrong in this regard. Amtote, in its original brief, presented Rules 2416 and 2460(D) of the Arkansas State Racing Commission Rules and Regulations (ed. 1989), covering horse racing in this state, to support its argument that Mr. Register's cause of action is barred by the Racing Commission rules.

Rule 2416 provides as follows:

> Any claim by a person that a wrong ticket has been delivered to him must be made before leaving the mutuel ticket window. No claim shall be considered thereafter and no claim shall be considered for tickets thrown away, lost, changed, destroyed or mutilated beyond identification. Payment of wagers will be made only on presentation of appropriate pari-mutuel tickets.

Rule 2460(D) provides that the Classix pari-mutuel pool shall be handled as follows:

(1) The net amount in the Classix pari-mutuel pool will be divided into the Major Share (75%) and the Minor (Consolation) Share (25%).

(a) The Major Share (75%) will be distributed among holders of Classix tickets which correctly designate the official winner in each of the six races comprising the Classix.

(b) The Minor Share (25%) will be distributed among the holders of Classix tickets which correctly designate the most official winners, but fewer than six, of the six races comprising the Classix.

In its petition for rehearing, Amtote again provided us with Rules 2416 and 2460(D), noting that it had cited "these rules in its brief, and this court may take judicial notice of rules and regulations promulgated pursuant to statutory authorization and brought to the attention of this court."

Taking judicial notice of Rules 2416 and 2460(D), they may well limit contractual liability; however, they do not restrict tort liability. The fact still remains that under our well-established principles of common law duty and the facts before us, a duty existed between Amtote and Mr. Register. Accordingly, I disagree with the court's present finding that our statutes and regulations preclude a claim of tort liability of Oaklawn Jockey Club, Inc. and Amtote.

Consequently, Amtote impermissibly attempts to reargue the interpretation of cases decided in other jurisdictions and does not point out any specific errors of law or fact thought to be contained in this opinion.

I respectfully dissent to the granting of the petition for rehearing.

GLAZE and CORBIN, JJ., join in this dissent.

## SUPPLEMENTAL OPINION ON DENIAL OF
## SECOND REHEARING
## FEBRUARY 3, 1992

822 S.W.2d 391

PER CURIAM. Petition for rehearing is denied.

ROBERT H. DUDLEY, Justice, concurring. The appellant, Paul Register, filed this case against appellees, Oaklawn Jockey Club, Inc., and American Totalisator Co., Inc. In his complaint he alleged that he attempted to place a winning Classix bet at the race track owned by Oaklawn Jockey Club, but, because of a malfunction by a betting machine installed by American Totalisator Co., his attempt to place the winning bet was not accepted. His complaint alleged counts of implied contract, quasi-contract, third party beneficiary, and negligence. On appeal, we unanimously affirmed the trial court's ruling on implied contract, quasi-contract, and third party beneficiary, but, again by a unanimous vote, reversed on the negligence count. *See Register* v. *Oaklawn Jockey Club, Inc.*, 306 Ark. 318, 811 S.W.2d 315 (1991). The appellees filed a petition for rehearing, and on a four-to-three vote, we granted rehearing on the negligence count. *See Register* v. *Oaklawn Jockey Club, Inc.*, 306 Ark. 318, 321, 821 S.W.2d 475 (1991). Thus, the appellant, for the first time, lost in this court on the negligence count. He has now filed a petition for a rehearing on that count, and at the same time suggested that this judge disqualify from the second rehearing because of an alleged appearance of impropriety. I decline the suggestion to disqualify.

The suggestion is based upon two (2) allegations. First, he alleges that there was an inappropriate telephone call to the Racing Commission by "someone identifying himself as a clerk at the supreme court." Second, he alleges there were "extra-judicial conversations with the attorney for the Arkansas State Racing Commission and with a former member of the Commission concerning this case" while they "may be in a special position to influence" this judge.

There was absolutely nothing wrong with the telephone call and, in addition, it did not in any way involve this judge. This judge read the suggestion for disqualification with bewilderment since he did not know who made the supposedly improper call. Later, at our conference on rehearing, another judge stated that he knew about the call. He stated that it came about in the following manner. The other judge, who incidently voted to deny the first rehearing, wanted to compare the regulations as set out by the appellees in their briefs with copies of the Racing Commission's original regulations. That judge asked one of his law clerks to go to the supreme court library and get a copy of the regulations for comparison. This was certainly a proper request since we were taking judicial notice of the regulations. The clerk went to the library but could not find the regulations. He asked an assistant librarian for assistance, and the assistant librarian ultimately telephoned the Racing Commission and asked for a copy of the regulations. That is the telephone call about which appellant complains. There was no impropriety whatsoever in it. The assistant librarian did nothing wrong in seeking a public document. In addition, it simply did not involve this judge. The appellant's suggestion that this judge disqualify because of the telephone call is balderdash.

The appellant additionally alleges that the attorney for the Racing Commission and a former member of the Commission may have tried to influence this judge on this second rehearing. Again, the suggestion is senseless. The facts are these. After the case had been handed down and after rehearing had been granted, this judge was in the presence of Byron Freeland and Dr. Malcolm Moore. Mr. Freeland is the attorney for the Racing Commission, and Dr. Moore is a Little Rock physician who grew up in Arkadelphia and, according to appellant's suggestion, was a member of the Racing Commission at some time in the past. Mr. Freeland either made some comment or asked some question about the phone call mentioned above. The essence of his statement or question was why would someone on this court want a copy of the Commission's regulations within an hour or so. This judge responded that he did not know about the phone call but assumed it involved a recent case about Classix betting and the Racing Commission's regulations. This judge commented that it had been an interesting case. Nothing more was said by either

person. The conversation was out in the open. It was not secretive in any manner. Mr. Freeland never made any suggestion whatsoever about the merits of the case. Upon reflection, it did not even appear that Mr. Freeland knew the name of the appellant, even though the case had received some media coverage. Dr. Moore, who was standing perhaps 10 yards away, said either that he knew, or that he knew of, the man who had tried to place the bet. He commented that the case involved a local football hero of many years past who had played for Henderson State College in Arkadelphia under the name of Cash Register and later played for the University of Arkansas under the name of Paul Register. He stated that Mr. Register was a nice man who later became an assistant coach at Texas A. & M. University. He asked if Mr. Register had won or lost his case, and this judge stated that he had lost. There was not even the slightest suggestion by Dr. Moore about how the case should be decided on rehearing. This judge rejects, without qualification, appellant's suggestion that the conversations were inappropriate in any manner. Neither Mr. Freeland nor Dr. Moore attempted to discuss the merits of the case or influence this judge. They would not attempt to do so, and this judge would not tolerate it if such were attempted. Further, the case came before us an an appeal from a summary judgment, so we must presume everything Mr. Register said is true.

Appellant's suggestion that this judge disqualify is declined, and I concur in the vote to deny the second rehearing.