# IN THE SUPREME COURT OF IOWA

No. 08–0586

Filed February 12, 2010

**TROY BLACKFORD,**

    Appellant,

vs.

**PRAIRIE MEADOWS RACETRACK
AND CASINO, INC.,**

    Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Eliza J. Ovrom, Judge.

The appellee seeks further review of the opinion of the court of appeals which held the casino did not have statutory or regulatory authority to withhold winnings from a person who had been involuntarily excluded from the gambling facility. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Ryan T. Beattie, Beattie Law Firm, P.C., Des Moines, for appellant.

Dennis P. Ogden and Margaret C. Callahan, Belin Lamson McCormick Zumbach Flynn, Des Moines, for appellee.

**BAKER, Justice**.

The appellee, Prairie Meadows, seeks further review of the opinion of the court of appeals which held the casino did not have statutory or regulatory authority to withhold winnings from a person who had been involuntarily excluded from the gambling facility. We determine that no contract existed between Prairie Meadows and Blackford, and, therefore, his claim of conversion must fail.

## I. Background Facts and Proceedings.

On May 5, 2006, appellant Troy Blackford went to Prairie Meadows Racetrack and Casino to gamble. Over the course of several hours, he won approximately $9,387 through a combination of slot machine cash tickets and one jackpot. Due to the high amount of Blackford's jackpot, Prairie Meadows was required to hand pay the prize money and issue Blackford a W-2 for tax purposes. Upon learning of Blackford's identity, Prairie Meadows refused to pay him because its records indicated Blackford had previously been involuntarily and permanently banned from entering Prairie Meadows's premises.

The record shows Blackford had been issued a "trespass ban" by Prairie Meadows in August 1996 because he had struck a slot machine and had broken the machine's belly glass. According to Prairie Meadows, this ban was permanent. As a result of this incident, Blackford pled guilty to criminal mischief and paid a fine. Prairie Meadows found Blackford on its premises again in March of 1998 and escorted him from the premises. Blackford pled guilty to trespass and paid a fine as a consequence of this second occurrence.

In 2000, Blackford wrote a letter to Prairie Meadows requesting that his ban be lifted. Prairie Meadows was unable to find this letter in May 2006 when Blackford won the jackpot, but discovered it at a later

date. Blackford claims he received a response letter from Prairie Meadows lifting the ban and that he showed it to several individuals. Prairie Meadows claims it never lifted the ban and has no record of a response letter, although its standard policy is to send the banned individual a response letter containing its decision. In January 2006, Blackford became a member of the Prairie Meadows's Slot Club, and Prairie Meadows's documents show Blackford gambled using the card at least once before May 5, 2006.

Because Prairie Meadows's records indicated Blackford was still banned as of May 5, 2006, he was escorted to the security office on that date, and his winnings were confiscated. As a part of this process, Prairie Meadows required Blackford to sign a trespass forfeiture form, donating all of his winnings to the Iowa Gambling Treatment Program. Blackford was then charged with trespassing and released. Following trial, the court dismissed the trespassing charge.

Blackford thereafter filed a petition against Prairie Meadows to recover damages based upon theories of conversion, libel, false imprisonment, and abuse of process. Blackford's false-imprisonment and abuse-of-process claims were later dismissed on Prairie Meadows's summary judgment motion. Blackford later dismissed his libel claim.

Blackford filed a motion to trifurcate the trial. In its denial of this motion, the trial court addressed the legal question of whether Prairie Meadows has the authority to confiscate winnings from patrons that are involuntarily banned from its premises. The court concluded it did, stating:

> Once a person is banned from a facility, it is not within the rules for the person to be present or to gamble at the facility. All promises, agreements, or contracts that arise from wagers or bets are void, unless the wager is authorized

under Chapter 99F (regulating gambling facilities in Iowa). Iowa Code § 537A.4. A person who is excluded from a facility under the rules of the Racing and Gaming Commission would not hold a legally binding agreement with a gaming facility for payment of the winnings. Therefore the facility would not be required to pay winnings to such person.

Over the objections of Blackford, the court submitted an instruction to the jury which declared that for the gambling winnings to be the property of Blackford, he must prove the trespass ban had been lifted by Prairie Meadows prior to May 5, 2006. The jury returned a verdict answering "No" to a special interrogatory on whether Blackford's trespass ban had been lifted. The court entered judgment in favor of Prairie Meadows and dismissed Blackford's conversion claim.

Blackford appealed. The court of appeals concluded the trial court erred in its pretrial ruling finding that Prairie Meadows would not be required to pay winnings to a person involuntarily excluded from the casino. It therefore reversed the trial court's decision and remanded for a new trial because it found no statutory provision allowed Prairie Meadows to confiscate Blackford's winnings. Prairie Meadows filed an application for further review which we granted.

**II. Scope of Review.**

This case was tried at law; therefore our review is for correction of errors at law. Iowa R. App. P. 6.907 (2009). In a law action, findings of fact are binding on us if supported by substantial evidence. *See EnviroGas, L.P. v. Cedar Rapids/Linn County Solid Waste Agency*, 641 N.W.2d 776, 781 (Iowa 2002). Blackford claims the issue in this case is whether Prairie Meadows has a right under the Iowa Code to withhold gambling winnings from involuntary trespassers. Statutory interpretation is also reviewed for correction of errors at law. *State v. Iowa Dist. Ct.*, 730 N.W.2d 677, 679 (Iowa 2007).

**III.  Discussion and Analysis.**

In this case, there is only one issue for our review:  whether Prairie Meadows had the authority to withhold winnings from a person who had been involuntarily banned from its gambling facility.  Blackford does not contend that there was insufficient evidence to support the jury's finding that he was still involuntarily banned from Prairie Meadows on May 5, 2006.

**A.  Gambling Law in Iowa.**  Under the Iowa Code, all gambling promises, agreements, and contracts are generally "void and of no effect."  Iowa Code § 537A.4 (2005).  The legislature, however, has made explicit exceptions to this rule where gambling is authorized under Iowa Code chapters 99B, 99D, 99G, or 99F.  *Id.*

The gambling that takes place at Prairie Meadows is authorized under Iowa Code chapter 99F.  *See id.* § 99F.4A(1) ("Upon application, the commission shall license the licensee of a pari-mutuel dog or horse racetrack to operate gambling games at a pari-mutuel racetrack enclosure subject to the provisions of this chapter . . . .").  Iowa Code chapter 99F.4 outlines the state racing and gaming commission's jurisdiction and powers over the gambling operations authorized by this chapter.  *Id.* § 99F.4.  Among these powers are the ability to require a licensee to remove a person violating a provision of this chapter or the commission rules, or any other person "deemed undesirable" from the gambling facility.  *Id.* § 99F.4(7).  The Iowa Racing and Gaming Commission also formulated regulations giving a gaming licensee the authority to eject or exclude any person from the licensee's facility.  *See* Iowa Admin. Code r. 491–5.4(5)(*d*).  This regulation provides:

> *d. Ejection or exclusion.*  A licensee may eject or exclude any person, licensed or unlicensed, from the premises or a part thereof of the licensee's facility, solely of the licensee's own

> volition and without any reason or excuse given, provided ejection or exclusion is not founded on constitutionally protected grounds such as race, creed, color, disability, or national origin.

*Id.* Prairie Meadows clearly had the authority to ban Blackford from its casino.

**B.    Conversion Claim.**    Blackford alleges Prairie Meadows intentionally misappropriated or took dominion or control over the jackpots he won on May 5, 2006.  He claims that such taking was wrongful and constitutes conversion of his property.  Conversion is " 'the wrongful control or dominion over another's property contrary to that person's possessory right to the property.' "  *Whalen v. Connelly*, 621 N.W.2d 681, 687 (Iowa 2000) (quoting *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999)).  In order to establish a conversion claim, the plaintiff must establish a possessory interest in the property.  *See Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 247 (Iowa 1988).

Blackford does not explain how his possessory interest arises, stating only that "[p]atrons expect to be paid their winnings and Blackford expected to be paid his."  He cites no authority for this proposition, nor explains the basis for this statement.  In its pretrial ruling, the trial court held that "[a] person who is excluded from a facility . . . would not hold a legally binding agreement with a gaming facility for the payment of winnings."  We agree with the trial court that Blackford was required to prove a legally binding contract with Prairie Meadows for the payment of winnings to prove a possessory interest in the jackpots he won on May 5, 2006.  *See Condon Auto Sales*, 604 N.W.2d at 593–94 (affirming judgment in the amount of $700 against the defendant on a claim of conversion of monies to which the plaintiff was entitled).

The nature of the contract created between a patron and a gambling establishment is an issue of first impression in Iowa. There appear to be two approaches to this issue. The first is that gambling interactions follow traditional contract theory with the requirements of offer, acceptance, and consideration. *See Ledoux v. Grand Casino-Coushatta*, 954 So. 2d 902, 907 (La. Ct. App. 2007) (stating "the law of contracts is determinative of the issues before us" in a breach of contract action against a casino for failure to pay out jackpots allegedly won); *see also In re Chomakos*, 69 F.3d 769, 771 (6th Cir. 1995) ("Where gambling is lawful . . . the placing of a bet gives rise to legally enforceable contract rights."); *Romanski v. Detroit Entm't, L.L.C.*, 265 F. Supp. 2d 835, 845 (E.D. Mich. 2003) (noting "[w]hen a person places money into a gambling game, that person is effectively entering into an aleatory contract with the casino"); *Sokaitis v. Bakaysa*, 975 A.2d 51, 56 (Conn. 2009) (stating "legal wagering . . . involve[s] an express or implied contract under which the consideration is 'money . . . bet' ").

The second approach is that gambling interactions do not create a traditional contract but a contract "completely determined by legislative enactment." *Marcangelo v. Boardwalk Regency Corp.*, 847 F. Supp. 1222, 1229 (D.N.J. 1994); *see also Tose v. Greate Bay Hotel & Casino, Inc.*, 819 F. Supp. 1312, 1317 n.8 (D.N.J. 1993) (stating "every aspect of the relationship between the gambler and the casino is minutely regulated by the state and there is little freedom of contract in the usual sense, there seems to be at least significant doubt that the New Jersey Supreme Court would recognize obligations not specifically called for by statute or regulations."); *Register v. Oaklawn Jockey Club, Inc.*, 811 S.W.2d 315, 317 (Ark. 1991) ("The Law specifically provides that the only legislatively authorized way for a patron at a race track to recover money

based upon the outcome of a horse race is through pari-mutuel or certificate system of wagering. Any wagering contract on horse races outside the scope of the Law is therefore invalid and illegal." (citations omitted)).

We hold that the traditional contract approach is more consistent with our statutory scheme and precedent. Iowa Code section 537A.4 refers to gambling contracts and provides that such contracts are legal if permitted under chapter 99F. The freedom to contract is not, however, unlimited. When a contract addresses an area of law regulated by a statute, the statutory provisions and restrictions are a part of the parties' contract. *See, e.g., Lee v. Grinnell Mut. Reins.*, 646 N.W.2d 403, 406–07 (Iowa 2002); *see also C & F Maint. & Prop. Mgmt., Inc. v. Eliason & Knuth Drywall Co.*, 418 N.W.2d 44, 45–6 (Iowa 1988) (recognizing that local building ordinances may be implied obligations of construction contracts). Chapter 99F does not contain a provision or a related regulation addressing whether the winnings of involuntarily banned individuals may be withheld. We must, therefore, employ traditional contract principles to analyze whether a contract requiring payment of Blackford's winnings has been formed under the facts of this case.

"All contracts must contain mutual assent; mode of assent is termed offer and acceptance." *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995). "An offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* (quoting Restatement (Second) of Contracts § 24 (1981)). "We determine whether an offer has been made objectively—not subjectively." *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001). " 'The test for an offer is whether it induces a reasonable

belief in the recipient that [the recipient] can, by accepting, bind the sender.'" *Anderson*, 540 N.W.2d at 286 (quoting *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995)).

In making an offer, "[t]he offeror is the master of his offer; just as the making of any offer at all can be avoided by appropriate language or other conduct, so the power of acceptance can be narrowly limited." Restatement (Second) of Contracts § 29, cmt. *a*, at 83. As master, the offeror may decide to whom to extend the offer. *Id.* § 29, at 83. According to the Restatement,

> (1) The manifested intention of the offeror determines the person or persons in whom is created a power of acceptance.

> (2) An offer may create a power of acceptance in a specified person or in one or more of a specified group or class of persons, acting separately or together, or in anyone or everyone who makes a specified promise or renders a specified performance.

*Id.*

In this situation, Prairie Meadows is the offeror. It makes an offer to its patrons that, if accepted by wagering an amount and the patron wins, it will pay off the wager. Simply stated, the issue is whether Prairie Meadows made an offer to Blackford. Because Prairie Meadows has the ability to determine the class of individuals to whom the offer is made, it may also exclude certain individuals. *Id.* Blackford had been banned for life from the casino. He was provided a notice which provided as follows: "ON THIS DATE YOU HAVE BEEN ADVISED THAT YOU HAVE BEEN PERMANENTLY DENIED ENTRANCE OR ACCESS TO THE FACILITY OF PRAIRIE MEADOWS RACETRACK AND CASINO." Under an objective test, unless the ban had been lifted, Blackford could not have reasonably believed he was among the class of individuals invited to accept Prairie Meadows's offer. The jury found that the ban against Blackford had not

been lifted, and, therefore, Prairie Meadows had not extended him an offer to wager. Because there was no offer to him, no contract could result. Without the contract, Blackford could not show a possessory interest in the jackpot, and his conversion action must fail.[1]

**C. Jury Instructions**. Blackford also objects to the jury instructions given by the district court. The court submitted the following instruction:

> In order for the winnings to be the property of Troy Blackford, he must prove by a preponderance of the evidence that the trespass ban against him had been lifted by Prairie Meadows prior to May 5, 2006.
>
> You are further instructed that a casino licensed to do business in our state is permitted to eject or exclude any person from the premises of the casino's facility solely of the casino's own decision, and without any reason or excuse given provided that the ejection or exclusion is not founded on a constitutionally protected ground, such as race, creed, color, disability, or national origin. This is known as a "trespass." If a person has been trespassed from a casino's facility, but returns and gambles at the facility, the trespassed person is not gambling according to the rules applicable to that facility, and such activities do not give the trespassed person any property right in the money or other valuable thing won during such gambling.

The jury was also asked to answer the following special interrogatory: "Had Troy Blackford's trespass ban at the Prairie Meadows facility been lifted before May 5, 2006?" The jury's answer was "no".

Blackford objected to this instruction on four grounds: (1) that Prairie Meadows does not have the right to withhold winnings from one who has been involuntarily banned from the casino; (2) that even if it did have the right, it was an affirmative defense and the burden was on

---

[1]Blackford sought only to recover the jackpot. He has not sought a return of the money gambled under a rescission theory or any other theory. *See, e.g.*, *Marcangelo*, 847 F. Supp. at 1229–31.

Prairie Meadows to prove the ban; (3) that Blackford was entitled to instructions of express and implied consent to show that the ban had been lifted; and (4) that the instruction placed undue emphasis on the rights of Prairie Meadows without any mention of Blackford's rights. In his brief, Blackford specifically states with respect to the fourth argument that he is "not assert[ing] this argument herein." It is therefore waived.

We have already disposed of his first objection. With respect to the second objection, Blackford was required to show that he had a possessory right to the winnings. *Kendall*, 424 N.W.2d at 247. To do so, he was required to show the existence of a contractual right to the money. *Seekamp v. Small*, 237 P.2d 489, 492 (Wash. 1951). In this case, it is Blackford's burden to prove the existence of a contract. *Cf. Anderson*, 540 N.W.2d at 283 (holding party seeking recovery on basis of breach of contract has the burden to prove the existence of such contract). Thus he was required to show that Prairie Meadows extended an offer to him. The existence of an offer was not an affirmative defense, but a subsidiary component of an element of Blackford's claim that he was required to prove. 18 Am. Jur. 2d *Conversion* § 94, at 218 (2004) ("Since, in order to maintain an action for conversion, the plaintiff must have an interest in the thing converted, carrying with it a right of possession at the time of the conversion, the burden rests on the plaintiff to establish his or her interest, and right of possession at the time of the conversion." (footnotes omitted)). The trial court properly placed the burden on Blackford.

Blackford's third objection must also fail. Blackford sought, based on the evidence produced, to have the jury instructed on express consent and implied consent, concepts from common law trespass. Blackford

cites his ownership of a slot club card, the numerous times he gambled at the facility between 1996 and May 5, 2006, and Prairie Meadows's ability to track its patrons' wagering as evidence that Prairie Meadows impliedly consented to his presence at the facility.

Blackford, however, failed to order the transcript of the trial. Iowa Rule of Appellate Procedure 6.803(1) provides: "If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion." Without the transcript, we cannot determine whether such an instruction was warranted.

Notwithstanding the failure to provide a proper record, Blackford's ability to enter into a gambling contract was addressed by the interrogatory and the jury's finding that the ban against Blackford had not been lifted. After analyzing all the evidence, the jury determined that Prairie Meadows's actions did not indicate Blackford's "trespass ban" had been lifted. If the ban was still in effect, no offer was extended to him, and his claim must fail.

### IV. Conclusion.

Because we find that Prairie Meadows had the authority to withhold winnings from a person who had been involuntarily excluded from the gambling facility, we affirm the district court's entry of judgment in favor of Prairie Meadows and dismissal of Blackford's conversion claim.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**