**IN THE COURT OF APPEALS OF IOWA**

No. 24-0777
Filed April 9, 2025

**RYAN COATES and JESSICA COATES,**
Plaintiffs-Appellees/Cross-Appellants,

**vs.**

**PATRICK BREHM and SHEILA BREHM,**
Defendants-Appellants/Cross-Appellees.
_____

Appeal from the Iowa District Court for Dubuque County, Monica Zrinyi Ackley, Judge.

Property sellers appeal the denial of their motion for summary judgment and the grant of summary judgment in favor of the buyers. The buyers cross-appeal the denial of their request for attorney fees. **REVERSED AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

D. Flint Drake and Samuel M. Degree of Drake Law Firm, P.C., Dubuque, for appellants/cross-appellees.

Peter D. Arling and Alyssa M. Carlson of O'Connor & Thomas, P.C., Dubuque, for appellees/cross-appellants.

Considered without oral argument by Greer, P.J., and Buller and Langholz, JJ.

**GREER, Presiding Judge.**

Timing is everything in the land of real estate sales, or so Ryan and Jessica Coateses argue in their quest to formalize their purchase of a property. Patrick and Sheila Brehm owned approximately fifty-acres of real estate; they placed it for sale with a realtor. After the Coateses submitted a written offer to purchase (Purchase Contract), they contend they secured a successful sales price of $1,500,000. But, as the Brehms argue, if an escalation clause in the addendum to the purchase contract for competing offers (Addendum) applied, the purchase price was $1,700,000. The Coateses contended that the escalation clause could not come into play because of the timing of the competing offer (it expired) and because the Brehms could not show it was an "acceptable" offer as required in the Addendum, given their behavior in later soliciting another offer. The Coateses petitioned for declaratory judgment to resolve the dispute over the two prices. Each side filed motions for summary judgment to determine the price, and the district court granted the Coateses' motion, determining that the Coateses bought the property for $1,500,000, and denying Brehms' motion for partial summary judgment. The Brehms appealed, and the Coateses cross-appealed requesting an award of attorney fees per the Purchase Contract.

We consider the escalation clause along with the other provisions of the Purchase Contract and Addendum and the undisputed facts. Based upon that review, we find that the timing of the agreement to pay $1,700,000, founded upon the application of the escalation clause, came after the time-out of the competing offer and that the documents' terms govern the sale. When fully considered, these documents support an agreement to pay the higher price. We reverse the ruling

of the district court and find that the correct purchase price is $1,700,000. We deny the cross-appeal for attorney fees.

**Factual Background and Proceedings.**

The timing of events was agreed upon by the parties.[1] It all began when realtor, Denise Ihrig, listed the Brehm property at a price of $1,789,920. An interested buyer, CTM Holdings, LLC (CTM), presented an offer to purchase for $1,650,000 on January 4, 2023, at 3:00 p.m., which was to expire on January 5, 2023, at 3:00 p.m. The Coateses had also shown interest in the property. And so, on the morning of January 5, Ihrig contacted the Coateses' realtor, Ron McCarthy, and alerted him that she had an offer with a higher purchase price than the Coateses had presented. In response, because he was having trouble with the software used to submit an offer, McCarthy sent a text message to Ihrig that he would be presenting an offer from the Coateses for $1,615,900. Ihrig told the Brehms, and they instructed her to reject that offer. Then, around 12:21 p.m. on that same day, McCarthy called Ihrig to alert her that the Coateses had submitted a formal offer of $1,500,000 that included an Addendum, which escalated the purchase price by $1,000 over any other competing offer made, up to a maximum of $1,700,000.

Now with a written proposal from the Coateses in the game, the Brehms told Ihrig to counter the new offer from the Coateses with a fixed purchase price of $1,700,000. Around 2:39 p.m., McCarthy called Ihrig and stated that a new offer had been submitted, which is the focus of this lawsuit. The new written proposal,

---

[1] Affidavits from all realtors involved supported summary judgment filings. Both sides also argued that the material facts were not in dispute.

sent around 2:44 p.m., again contained a base purchase price of $1,500,000 with an Addendum, but this time the offer would increase by $50,000 over any competing offer made, up to a maximum price of $1,700,000. Ihrig secured permission from the Brehms to share the CTM offer details with McCarthy. She sent a copy to him at 2:57 p.m. on January 5, just before it expired. She re-sent it to McCarthy at 3:01 p.m. because he requested she send the offer to a different email address. And at 3:07 p.m., Ihrig sent McCarthy a text message that said "thoughts?" He replied within a minute, stating, "we have a deal at [$]1.7."

After receiving this confirmation, Ihrig contacted CTM to see if they would increase their offer to $1,750,000. CTM declined. The Brehms signed the Purchase Contract and the Addendum, which provided: "Seller did receive a Competing Offer for $1,650.000 net purchase price and per this Addendum, makes the accepted net purchase price $1,700,000." Below this statement, it was noted: "Final Accepted Gross Purchase Price $1,700,000."

But on January 6, McCarthy called Ihrig and told her that the purchase price was $1,500,000 because the CTM offer expired at 3:00 p.m. on January 5—before the Coateses and Brehms reached a deal.

Because the parties disagreed as to the amount of the purchase price, the Coateses petitioned for declaratory judgment. They asserted there was "a genuine dispute between the parties as to whether the escalation addendum was triggered and, accordingly, the parties cannot agree upon the proper purchase price for the Property." The Brehms counter-claimed, arguing that the agreed purchase price was $1,700,000 or, in the alternative, there was no meeting of the minds so no contract to purchase existed. The parties filed dueling motions for summary

judgment, and the district court determined that the undisputed facts supported the $1,500,000 purchase price. After that decision, the Coateses moved to reconsider and asked for attorney fees pursuant to the Purchase Contract terms. The district court denied the request for attorney fees.

The Brehms appeal, and the Coateses cross-appeal.

**Scope and Standard of Review.**

"When we review a declaratory ruling entered on summary judgment, . . . our scope of review is for correction of errors at law." *See Kline v. SouthGate Prop. Mgmt., LLC*, 895 N.W.2d 429, 436 (Iowa 2017). In conducting our review, we are guided by our standards for summary judgment:

> Summary judgment is proper when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law. "The burden is on the moving party to demonstrate that it is entitled to judgment as a matter of law." As we determine whether the moving party has met this burden, we view the record in the light most favorable to the nonmoving party. "Even if facts are undisputed, summary judgment is not proper if reasonable minds could draw from them different inferences and reach different conclusions."

*Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014) (internal citations omitted).

**Discussion.**

Both parties frame the pertinent question as whether the escalation clause applies to the transaction so that the higher purchase price must be paid by the Coateses. But this contract contains more than an escalation clause. So, we start by examining the effect of all the written terms as read together. *See U.S. Bank, Nat'l Ass'n v. Bittner*, 986 N.W.2d 840, 848 (Iowa 2023) (noting that an interpretation of a contract that "gives a reasonable, lawful, and effective meaning

to all terms is preferred").  The Purchase Contract included an Addendum with an escalation clause that both parties point to; it states:

> Should any other bona fide offer with terms acceptable to Seller (herein "Other Offer") be presented, or considered by the Sellers on the Property, prior to the expiration of the acceptance deadline provided in this Purchase Contract, or during any subsequent negotiations between Buyer and Seller, Buyer agrees to increase the net purchase price of the Purchase Contract to be $50,000.00 greater than the net purchase price of other offers that do not include a Subject-To-Sale Addendum, up to a maximum net purchase price of $1,700,000.00.

The Brehms assert this clause applied because they would have accepted the CTM offer that was shared with the Coateses' realtor, McCarthy, but for the Coateses' representation that there was "a deal at [$]1.7."  No one disputes that the CTM offer was a "bona fide offer" that was "presented, or considered" by the Brehms.  Instead, the Coateses assert this escalation clause was not activated because the Brehms cannot show the CTM terms were acceptable to them.[2]  The Coateses support this assertion with two arguments: (1) the CTM offer expired before the escalation clause in the Addendum was triggered and (2) after receiving the first CTM offer, the Brehms solicited a second CTM offer, which shows the earlier offer obviously was not "acceptable."  While the escalation clause was the main focus in the dueling summary-judgment motions, after reviewing all of the terms of the written Purchase Contract and Addendum, we conclude a different outcome is required.  *See id.* ("[I]nstruments relating to the same transaction which

---

[2] An affidavit signed by the Brehms represented that they were on their way to accept the CTM offer prior to its expiration and would have, but for the negotiations with the Coateses.  Ihrig's timeline of events shows the Brehms at their attorney's office at 2:44 p.m. on January 5.

are contemporaneously executed should be construed together." (citation omitted)).

Because the Coateses prepared the Purchase Contract and Addendum, its terms are generally construed against them. *See Peak v. Adams*, 799 N.W.2d 535, 548 (Iowa 2011) ("We generally construe ambiguous boilerplate language against the drafter."). And although the focus is on the escalation clause and how it might apply to these facts, the contract contains many terms that impact this case. "The cardinal rule of contract interpretation is to determine the intent of the parties at the time they entered into the contract." *Id.* at 544. And to find the parties' intentions at the time of contracting, we look to the words of the contract. *See id.*

First, there are timing issues. The Coateses' Purchase Contract indicated it was presented at 2:44 p.m. on January 5. Upon receipt, Ihrig sent McCarthy the CTM written purchase proposal, first at 2:57 p.m., and then again at 3:01 p.m. Once McCarthy had the CTM document, the Coateses knew the CTM offer was to expire that day at 3:00 p.m. And yet at 3:08 p.m., the Coateses' agent responded by invoking the terms of the Addendum and confirming "we have a deal at [$]1.7." While later the *next day* McCarthy pointed out the expiration of the CTM offer and asserted it impacted the escalation clause, in this context, that sounds more like buyers' remorse and less like a basis for walking back the informed confirmation of the deal. Thus, we do not consider the Coateses' contention—that the CTM offer expired so it was not a "acceptable" offer that could trigger the escalation clause—a viable theory under contract law.

"An offer is a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 189 (Iowa 2010) (cleaned up). The Coateses could have pointed to the expiration of the CTM offer before they confirmed the $1.7 deal at 3:08 p.m., but they did not make its expiration part of the continuing negotiations. "[T]he offeror is the master of his offer; just as the making of any offer at all can be avoided by appropriate language or other conduct, so the power of acceptance can be narrowly limited." *Id.* at 190 (citation omitted). We see no ambiguity in the language that McCarthy, acting as the Coateses' representative, used—"we have a deal at [$]1.7."

Next, the Coateses assert that the "acceptable" condition was not met when the Brehms solicited a second offer from CTM. But the terms of the Purchase Contract gave the Brehms the right to continue seeking other offers until settlement, defined in the Purchase Contract as "on or before 02/14/2023." We read all terms of the contract together. And although the Coateses argue that when the Brehms sought a counter-offer it meant that the "other [CTM] offer" was not "acceptable" to the Brehms, the Purchase Contract specifically stated: "Broker may continue to offer and show the property for sale and Seller may accept backup offers until settlement." Thus, there was no prohibition against seeking a backup offer until the deal was settled. And the escalation clause did not require that the competing offer be *accepted* by the Brehms; it required only that there was a bona fide offer with acceptable terms that was presented or considered by the Brehms.

To argue that the CTM offer to pay $1,650,000 was not "acceptable" but that the Brehms agreed to a purchase price of $1,500,000 is nonsensical.

Even more, the Addendum that was provided by the Coateses stated that "the Escalating Factors of *Other Offers* may result in multiple escalations" which suggests that there might be more than one bona fide offer presented during the negotiations. (Emphasis added.) And the Addendum also contained this section:

**SELLER RESPONSE TO ADDENDUM TO PURCHASE CONTRACT FOR COMPETING OFFERS**

Seller acknowledges and affirms that upon Seller's acceptance of this Offer and Escalation Clause Addendum that such acceptance has been made of his/her own volition and at his/her own discretion and Seller agrees to hold its agents and brokers harmless with regard to acceptance or rejection of the Offer with attached Addendum to Purchase Contract for Competing Offers.
(Select One of the following):

☐ Seller did not receive another offer on this property which makes this Addendum Null and Void.

X Seller did receive a Competing Offer for $1,650.000 net purchase price and per this Addendum, makes the final accepted net purchase price $1,700,000 . *

*Final Accepted Net Purchase Price _____ + Seller's Credits to Buyer _____ =
Final Accepted Gross Purchase Price $1,700,000 .

Seller _Patrick Brehm_ 1/5/23 Seller _Sheila Brehm_ 1/5/23
Agent _Denise Ihrig_
dotloop verified
01/05/23 3:54 PM CST
JZUN-HJAJ-XGX9-DXHV

Again, in construing all of the terms of these documents together, this seller response section created a form to set out how a seller, in this case the Brehms, would alert the buyer to the net purchase price and the accepted gross purchase price, requiring the seller to disclose the "*Competing Offer*" that would trigger the final purchase price. (Emphasis added.) Following the form provided, the Brehms checked the section that stated: "Seller did receive a Competing Offer for $1,650,000 net purchase price and per this Addendum, makes the final accepted net purchase price $1,700,000.*" The asterisk referenced the terms: "Final Accepted Gross Purchase Price $1,700,000." Thus, based upon the contract language, the seller response section allowed confirmation that the competing offer triggered the escalation formula so that, in this case, the purchase price of

$1,700,000 applied. The Coateses and the district court mostly ignored the implication of these last paragraphs of the Addendum; we cannot in our role construing the terms of the full agreement.

Finally, in the Purchase Contract, it was checked that the "foregoing offer" was "ACCEPTED." All parties signed both the Purchase Contract and the attached Addendum. And as noted, McCarthy earlier sent a message confirming the deal was for $1,700,000. Nothing is unclear about the terms of the final pricing as confirmed by both parties. *See Peak*, 799 N.W.2d at 544 ("A contract requires a meeting of the minds.").

We reverse the summary judgment ruling in favor of the Coateses; the district court should have found that the terms of the contract as applied, under the facts that evolved through the negotiations, resulted in setting an agreed purchase price of $1,700,000. And because the Coateses were not the successful party, we affirm on cross-appeal the district court's denial of their request for attorney fees. We remand for entry of judgment in favor of the Brehms.

**REVERSED AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**