# IN THE SUPREME COURT OF IOWA

No. 20–1035

Submitted February 22, 2022—Filed June 24, 2022

**JAMES C. LAREW,**

  Appellant/Cross-Appellee,

vs.

**HOPE LAW FIRM, P.L.C.,**

  Appellee/Cross-Appellant,

and

**ANDREW L. HOPE, TRAVIS J. BURK** and **HOPE LAW FIRM & ASSOCIATES, P.C.,**

  Appellees.

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

The parties appeal the district court's ruling in an action involving former co-counsel on a contingent-fee case asserting error in the district court's determination of the terms of an implied-in-fact contract, quantum meruit calculation, successor liability, and related causes of action. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

McDermott, J., delivered the opinion of the court in which Appel, McDonald, and Oxley, JJ., joined. Waterman, J., filed an opinion concurring in part and dissenting in part in which Christensen, C.J., and Mansfield, J., joined.

Craig Kelinson (argued) and Dean Lerner (argued) of Kelinson & Lerner, PLC, West Des Moines, for appellant/cross-appellee.

Bruce H. Stoltze (argued) and John Q. Stoltze of Stoltze & Stoltze, PLC, Des Moines, for appellees.

**McDERMOTT, Justice.**

The Hope Law Firm agreed to represent a client in a contingent-fee case. Lawyer James Larew had an of-counsel arrangement with the Hope Law Firm and agreed to work on the client's case in exchange for a portion of the firm's fee. But during the course of the case, Larew's relationship with Andrew Hope (the Hope Law Firm's owner) soured, and Larew and the firm ended the of-counsel arrangement. Larew nonetheless continued to work on the case, ultimately winning a large judgment at trial. Litigation ensued over the disposition of the fee. In this appeal, we address a bevy of claims in "the lawsuit after the lawsuit" between dueling lawyers.

I.

Larew operates a law practice in Iowa City. Hope operates a law practice—the eponymous Hope Law Firm—in Des Moines. In June 2011, Larew and the Hope Law Firm entered into a written of-counsel agreement. The of-counsel agreement stated that "[t]he Firm shall assign cases to the Attorney, and the Attorney may accept said cases as an of counsel attorney." The firm agreed to "provide clerical and administrative support for the Attorney as necessary and proper." Larew (as the "Attorney") was responsible for "manag[ing] the performance of all activities customarily comprising the practice of law."

The agreement provided for Larew's compensation and reimbursement as follows:

> Attorney shall be entitled to forty percent (40%) of the net fees collected on cases litigated by Attorney. Net fees comprise those amounts received by the Firm after accounting for all of the Firm's outside expenses associated with a given case, including, but not

> limited to court costs and fees for expert services. Expenses, for the purpose of figuring net fees in the context of compensation, do not include general overhead expenses such as advertising, utilities, travel, housing (if outside of Des Moines and Iowa City), etcetera.
>
> . . . <u>Costs.</u> In addition to compensation, in the event that Attorney shall incur out of pocket costs with respect to the performance of the activities contemplated by this Agreement, Attorney shall be re-imbursed for the same upon presentation to the Firm of an itemization of said costs. Costs shall include those types of expenses normally recognized as deductible business expenses.

The of-counsel relationship was "at will" and could be terminated by either party without notice but "[a]ny and all cases brought in by, or assigned to, the Attorney after the execution of this Agreement are property of the Firm, even after the Attorney's of counsel relationship with the firm ends." Larew was added as an "of counsel" lawyer to the Hope Law Firm's letterhead and website.

In December 2011, Hope and Larew traveled to Minnesota to meet with a prospective client to discuss a potential claim for a bad-faith denial of insurance coverage. The prospective client was an entity named Swanny of Hugo, Inc., which operated a restaurant in Hugo, Minnesota. The restaurant's building had been destroyed by a fire and Swanny's owner, Catherine Anderson, disputed the insurance carrier's payout under the corporation's business income and other coverages.

Hope and Larew were interested in taking the case. But they first had to arrange local counsel in Minnesota since the lawsuit would need to be filed in Minnesota and neither was licensed to practice there. They located a Minnesota lawyer named Lucas Wilson who agreed to serve as local counsel.

Anderson (on behalf of Swanny), the Hope Law Firm, and Wilson—but not Larew—signed a contingent-fee agreement setting forth the terms of the representation. The agreement provided for a contingent fee of 38% to the lawyers if the case was resolved without an appeal filing and 40% if there was an appeal. The agreement allowed the lawyers to the agreement—the Hope Law Firm and Wilson—"in [their] sole discretion and . . . expense" to "associate any other attorney in the representation of the Client's Claims." Larew began work on the case under the existing of-counsel agreement with the Hope Law Firm. Hope, Larew, and another attorney affiliated with Larew's firm named Claire Diallo were all admitted pro hac vice in Minnesota to work on the case.

But in 2012 the relationship between Larew and Hope began to deteriorate, and in December Larew asked Hope to remove him from the Hope Law Firm's letterhead and website. The of-counsel agreement was formally terminated in May 2013. As they negotiated details of their separation, Larew and Hope settled on how cases and fees would be split in some, but not all, of the cases that Larew had worked on. Although both Larew and Hope agreed that Larew would continue to work on the Swanny case, there was no agreement on how any potential recovery in that litigation would be divided. At one point, Hope proposed that Larew take 95% and the Hope Law Firm take 5% of the fee, but Larew countered that he should receive 100% and the firm 0% since they had agreed to a similar division in a different case where the roles were reversed.

During their discussions about separation, Hope warned Larew that any attempt Larew might make to secure a separate contract with any of the Hope

Law Firm's clients would risk a claim of intentional interference with an existing contract. Larew responded that he understood that the client engagements were with the Hope Law Firm and that he wouldn't "take on full representation of any client without a separate attorney–client agreement with said client."

All the while, the Swanny litigation continued. Neither Larew nor Hope informed Anderson, or local counsel Wilson, that Larew's affiliation with the Hope Law Firm had ended. Larew acknowledges that he and Hope both failed in their ethical duties of disclosure to the client on this subject. Hope, for his part, disclaimed any ethical duty to disclose to the client that Larew no longer associated with his firm, asserting this duty fell solely on Larew.

Larew never executed a separate agreement with Anderson to represent Swanny in the litigation. The lawyers remained as counsel of record throughout the litigation. But Hope's involvement diminished as Larew began handling nearly all aspects of the representation. Larew's office, for instance, paid all out-of-pocket expenses in the case after May 2013. Larew handled all the considerable motion practice that the case required and took ten depositions in three states leading up to trial. Larew handled the eight-day trial in Minnesota that concluded with the jury's verdict on October 16, 2013. Hope had no communications with Larew in the four months leading up to trial, and did not attend the trial.

The jury determined that Swanny had proved several breaches of the insurance contract, including breach of the business income provision, and awarded $1,134,500. Because Swanny's claim succeeded on the merits, the case

proceeded to a separate "bad faith" phase to determine an amount to award for taxable costs and attorney fees based on the absence of a reasonable basis for the insurance carrier's denial of benefits under the policy. Hope emailed Larew about a week after the trial, congratulating Larew on the verdict and asking to be updated on the bad-faith phase so Hope could prepare an itemization of the Hope Law Firm's time spent on the case.

The record contains conflicting accounts about discussions with the client over bringing in separate counsel to handle the ensuing stages of the case, including a likely appeal. Larew and Diallo testified that the group never discussed bringing on different counsel with Anderson. Wilson testified that he recommended to Anderson that appellate counsel be brought in. Hope and Travis Burk, another attorney employed at the Hope Law Firm involved in some of the communications, both testified that Wilson suggested bringing in appellate counsel as well.

Burk soon called Minnesota attorneys Brenda Sauro and Adina Bergstrom about possibly handling post-verdict issues in the Swanny litigation. Hope and Burk traveled to Minnesota to meet with Sauro, Bergstrom, and Wilson. Sauro and Bergstrom agreed to take on the representation and negotiated an addendum to the fee agreement that Anderson had previously entered into with the Hope Law Firm and Wilson. It stated that Anderson, the client, "authorizes and agrees that *only*" the Hope Law Firm, Wilson's firm, and Sauro and Bergstrom's firm "handle all aspects of the Action . . . from the date of this Agreement forward." (Emphasis added.) The fees to Sauro and Bergstrom's firm

would be paid from the fees owed under the original contingent-fee agreement—38% prior to appeal and 40% if an appeal is filed. Sauro and Bergstrom's firm would be paid hourly fees up to $40,000 and a "retroactive" contingent fee (taken from the verdict already won) of 5% if the case was resolved without an appeal filing, 10% if an appeal was initiated to the Minnesota Court of Appeals, and 12.5% if an appeal was initiated with the Minnesota Supreme Court.

Anderson signed the addendum—without Larew's knowledge—on October 31. At the time they signed the addendum, neither Sauro, Bergstrom, Wilson, nor Anderson were aware that Larew and the Hope Law Firm had ended their relationship. Sauro asked Hope at their meeting if things were "worked out" with trial counsel and Hope said "yep." Hope testified that he thought Larew could continue working on the case and that he wasn't trying to remove Larew.

Larew first learned of Sauro and Bergstrom's involvement after calling Wilson on November 1. Wilson informed Larew that Sauro and Bergstrom would handle the case moving forward. Hope emailed Larew that same day, stating that he had "discussed this case at length with Brenda Sauro and Adina Bergstrom." He continued:

> Their description of the complexity of post trial litigation and appellate practice in Minnesota leads me to the conclusion that Catherine Anderson's interests will be best served by having experienced and successful Minnesota counsel handle this matter from this point forward. Adina and Brenda have agreed to associate with Hope Law Firm and Wilson Law and handle all matters going forward. We've met with Catherine and she has consented to the association and has signed the attached addendum to the fee agreement with my firm and Wilson Law.

Larew called Anderson and informed her, for the first time, that he was no longer associated with the Hope Law Firm, and thus that the addendum she'd signed meant that Larew and Diallo wouldn't continue on the case. Larew admitted that his agreement with the Hope Law Firm had ended months before and apologized for not telling her sooner. Larew advised Anderson to seek independent legal counsel on the issue and expressed his concern that the new lawyers wouldn't adequately represent Swanny. A few days later, Anderson, after hearing from all parties, decided to retain the Hope Law Firm, Wilson, and Sauro and Bergstrom's firm and to terminate Larew, directing Larew and Diallo to withdraw from her case. Larew and Diallo withdrew as directed and cooperated with Sauro and Bergstrom in turning over their Swanny files. Sauro testified that, after reviewing Larew's files, it was clear that Larew and Diallo weren't ready for the upcoming bad-faith proceedings.

Under Sauro and Bergstrom's lead in the post-verdict proceedings and a later appeal to the Minnesota Supreme Court, Swanny received an award of an additional $575,000 for interest and costs, bringing the total verdict to about $1.7 million. The insurance carrier satisfied the judgment by April 2016. A fee dispute broke out over the amount owed to Sauro and Bergstrom under the addendum. Sauro and Bergstrom argued that they were entitled to 12.5% of the gross recovery. Hope and Wilson argued that Sauro and Bergstrom's share was instead 12.5% of the 40% of the total attorney fees that the lawyers altogether were entitled to (thus about 5% of the gross recovery). The firms ultimately agreed on a split of the 40% contingent fee with Anderson's approval. Of the

$683,483.19 in fees, Sauro and Bergstrom received $166,062.17, the Hope Law Firm received $388,421.02, and Wilson's firm received $129,000.

Larew submitted an application for an attorney's lien on the judgment in the Swanny case in March 2014. The Minnesota district court denied the application, finding that he had neither an express nor implied agreement with Anderson, analogizing Larew's position to an associate at a law firm, and thus Larew's sole source of recovery was against Hope or the Hope Law Firm. Larew filed a motion to reconsider his application for an attorney's lien after the final judgment was entered in the Swanny litigation, which the court again denied. Larew later filed a second motion seeking an attorney's lien, this time under a quantum meruit theory, which the court once again denied.

Larew requested that Hope place the disputed fees that the Hope Law Firm received from the Swanny litigation in the firm's trust account. Hope refused, and instead placed the funds into the Hope Law Firm's operating account. Hope asserted that the funds didn't belong in the firm's trust account because they weren't client funds and were earned by the Hope Law Firm. Hope testified that Larew's payments under the of-counsel agreement had always been paid from the firm's operating account.

Larew filed this lawsuit on January 9, 2018, against Hope, Burk, and the Hope Law Firm, P.L.C. At the time of the filing—and for the entire period of Larew's of-counsel agreement in 2011 until that date—the Hope Law Firm had been organized under the name "Hope Law Firm, P.L.C." The P.L.C. designation referred to the entity's status as a "professional limited company." *See* Iowa Code

§ 489.1103. But three days after Larew filed his lawsuit, the firm changed its name to "Hope Law Firm & Associates, P.C." The P.C. designation referred to the entity's new status as a "professional corporation." *See id.* § 496C.5. Larew amended his petition to include Hope Law Firm & Associates, P.C. He pleaded claims for breach of express contract, breach of implied contract/quantum meruit, promissory estoppel, unjust enrichment, conversion, intentional interference with contractual relations and prospective business advantage, conspiracy, and punitive damages. The defendants denied liability under each count and counterclaimed for intentional interference with the Hope Law Firm's contract with Swanny and also sought punitive damages.

Larew filed a motion for partial summary judgment, arguing that there was no genuine issue of material fact as to whether the Hope Law Firm was liable to Larew in *some amount* for Larew's professional services. The district court denied summary judgment on almost all the counts, but agreed that the Hope Law Firm was liable to Larew for some amount and granted partial summary judgment on that issue, leaving the amount to be decided at trial. The district court found no dispute about Larew's claim for expenses advanced in the Swanny case and ordered the Hope Law Firm to reimburse Larew $42,055.91, plus interest.

At trial, Larew sought damages under a quantum meruit theory for the value of his office's work (including Diallo's and an administrative assistant's time) calculated on an *hourly* rate that totaled $873,835. He also argued that Hope intentionally interfered with his prospective business opportunity to conduct the bad-faith phase of the litigation in Minnesota, and sought damages

for $72,000 (calculated at 38% of the $250,000 statutory cap). He also claimed damages for conversion and conspiracy, and requested punitive damages. The Hope Law Firm countered that any amount it owed to Larew should be offset against damages occasioned by Larew's intentional interference with their contract with Swanny.

The district court found that Larew performed most of the work in the Swanny litigation from December 2011 until the jury's verdict in October 2013. The court found Wilson served as a point of contact for the client and ensured the proper filing of pleadings in Minnesota. The court found Burk "had little if any involvement in the Swanny litigation." The court found that the Hope Law Firm initially provided administrative assistance on the case, but had virtually no involvement in the litigation after the of-counsel agreement ended through the verdict.

The district court found that if the of-counsel agreement had remained in place, Larew should have expected to receive at best 40% of the net fees collected by the Hope Law Firm. The court found that Larew and the Hope Law Firm spent 54.4% of their total hours on the case *before* the of-counsel agreement ended and 45.6% after it ended. Including the hours spent after the of-counsel agreement ended, Larew's hours were 75.4% of the total and the Hope Law Firm's were 24.6%.

The district court determined that there was no express contract between the parties after the of-counsel agreement ended, but found no dispute that Larew was expected to continue working on the Swanny litigation. The court

thus based payment for Larew's work on an implied-in-fact contract for the reasonable value of his services and applied quantum meruit principles to calculate the fee from the termination of the of-counsel agreement forward. The court used the percentage stated in the agreement (60% to the firm and 40% to Larew) for the period before the termination of the agreement, and awarded 100% to Larew for the period after the termination of the agreement (and until Anderson terminated Larew) because Larew during that post-termination period performed all the work. Larew's total fee under this calculation came to $261,640.39.

The district court dismissed Larew's remaining claims. It found that his promissory estoppel and unjust enrichment theories duplicated the court's implied-in-fact contract award and that Larew hadn't proven conversion, intentional interference with prospective business advantage, or conspiracy. The court similarly refused to award punitive damages, finding that Larew hadn't provided sufficient evidence to show an intentional tort or that the defendants acted with malice. The district court likewise found insufficient evidence that the Hope Law Firm's new entity, Hope Law Firm & Associates, P.C., was a successor entity to Hope Law Firm, P.L.C., and thus refused to apply Larew's award to the new entity. And the court similarly found evidence lacking that Hope and Burk were individually liable to Larew. The district court also found insufficient evidence to support the Hope Law Firm's counterclaim against Larew for intentional interference with contract based on the client's full performance of its contract with the Hope Law Firm.

Larew appeals, and the Hope Law Firm cross-appeals.

## II.

Neither Larew nor the Hope Law Firm challenge the district court's conclusion that an implied-in-fact contract existed. Larew argues that the district court erred in its findings about the terms of that implied contract, asserting that the court should have declared that it authorized him to remain as lead counsel throughout the post-verdict litigation and that Hope unlawfully orchestrated the client's firing of Larew and agreed to the addendum to the contingent-fee contract retaining (and paying) Sauro and Bergstrom to work on the case. We review contract claims tried by ordinary proceedings for correction of errors at law. *Roger's Backhoe Serv., Inc. v. Nichols*, 681 N.W.2d 647, 649 (Iowa 2004).

We recognize, as an initial matter, that this appeal presents a civil action and not an attorney disciplinary case, and for that reason our analysis concentrates on the legal issues that the parties have brought before us. But we would be remiss in failing to note—indeed, to underscore—that Iowa Rule of Professional Conduct 32:1.4(b) imposes an unequivocal duty on lawyers to explain matters to their clients "to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Both Larew and Hope failed to inform Anderson of Larew's separation from the Hope Law Firm, either when it happened or in the many months after and through the trial. Had Larew or Hope actually fulfilled this ethical duty, *the client* would have been permitted to decide with whom and on what terms it would continue the

representation—consistent with the client's role and right. The clarification in responsibilities and compensation that likely would have flowed from that required disclosure (lawyer ethics rules operating, as they often do, to the benefit of both lawyer and client) almost certainly would have avoided many of the disputed issues over which they've battled in this case.

An implied-in-fact contract exists when "an offeree takes the benefit of offered services with reasonable opportunity to reject them and reason to know that they were offered with the expectation of compensation." *Roger's Backhoe Serv., Inc.*, 681 N.W.2d at 651 (quoting Restatement (Second) of Contracts § 69(1)(a) (Am. L. Inst. 1981)). While an express contract is based on *words*, an implied contract is based on *conduct. McKee v. Isla of Capri Casinos, Inc.*, 864 N.W.2d 518, 526 (Iowa 2015). As with an express contract, an implied contract requires a "mutual manifestation of assent by the parties to the same terms." *Rucker v. Taylor*, 828 N.W.2d 595, 601 (Iowa 2013) (quoting *Ringland-Johnson-Crowley Co. v. First Cent. Serv. Corp.*, 255 N.W.2d 149, 152 (Iowa 1977)). There can't be an implied contract when there is an express contract. *McKee*, 864 N.W.2d at 526.

In this case, the parties had an express contract—the of-counsel agreement—but it ended in the middle of the Swanny case in May 2013. The district court correctly found that, from that point until the client terminated Larew shortly after the trial, the parties had an implied contract. The only agreed terms of the implied contract appear to be (1) that Larew would continue to represent the client and (2) that Larew would be compensated for his work. There

was no agreement about how Larew would be compensated or whether new counsel could be brought into the case.

Larew performed his end of the implied-in-fact contract by continuing to represent the client through trial. He is entitled to damages under the concept of *quantum meruit*, which refers to his right to receive a reasonable amount for services he provided with the Hope Law Firm's assent but without the parties having made an express contract on the subject.

The parties train most of their fire on the district court's calculation of Larew's fee. Larew argues that the district court erred in applying a mix of express and implied terms and capping Larew's fees by limiting Larew to the amount actually collected by the Hope Law Firm. He also argues that the district court erred by failing to consider various equitable factors in analyzing his quantum meruit claim, such as when and how the breach occurred, the risks associated with the litigation, and the respective contributions of each lawyer. Finally, Larew argues that the court should have used the "lodestar method" to calculate his quantum meruit fee by multiplying the hours worked by a reasonable hourly rate for a total fee of $873,839.

The Hope Law Firm counters that the contingent-fee agreement, with its addendum, sets the upper bound for Larew's fee claim. And because the of-counsel agreement was the only agreement that Larew and Hope had ever actually agreed to as a basis for dividing fees, that agreement (with its 60/40 split) should apply notwithstanding the termination of the of-counsel agreement partway through the case. The firm also argues that Larew's failures to inform

the client that his relationship with the firm had ended and to secure a separate fee agreement with the client similarly require the court to apply the terms of the of-counsel agreement. The firm contends that the district court's calculation diverging from the full application of the of-counsel agreement's split undervalues the importance of Hope's discovery of the client (without which there is no case) and the firm's assistance for a substantial portion of the case. The firm further argues that Hope's share of the fees should be calculated from a lower starting number to offset the fees that the firm had to pay a Minnesota attorney to defend against Larew's multiple unsuccessful attorney lien filings and to offset other fees paid to Sauro and Bergstrom.

In *Phil Watson, P.C. v. Peterson*, we addressed a law firm's claim for fees under a quantum merit theory after an associate attorney left the firm and took clients in a batch of pending cases with him to a new firm. 650 N.W.2d 562, 563 (Iowa 2002). Before leaving the plaintiff firm, the defendant lawyer quietly enlisted thirty clients to sign a form authorizing him to continue their representation and to take their files to his new firm. *Id.* Ten of these clients had contingent-fee agreements with the plaintiff firm. *Id.* The defendant agreed that the firm was owed *some* share of the contingent fee ultimately recovered in those cases; the question was how much. *Id.* at 566. We rejected the firm's lost-profits theory and held that "[w]hen a contingency-fee case is concluded after the termination of the attorney–client relationship, the attorney is entitled to be paid the value of his services under a quantum-meruit theory, but not on the basis of the contract amount." *Id.* at 567. We calculated the hours the defendant spent

on the contingent-fee cases both while he was at the firm and after he left it, and we awarded compensatory damages to the firm proportional to the defendant's time spent on each case while at the firm. *Id.* at 568.

Larew argues that the district court, by calculating pre-termination fees under the of-counsel agreement's 60/40 split and capping Larew's recovery by the amount Hope ultimately collected under the contingent-fee agreement and addendum, failed to apply the quantum meruit approach set forth in *Watson*. Larew urges us to apply an even broader method to determine the value of his work under a quantum meruit theory, reciting a list of factors that we analyzed in a fee dispute in *Kelly, Shuttleworth & McManus v. Central National Bank & Trust Co. of Des Moines*, 248 N.W. 9 (Iowa 1933), and out-of-state cases. He argues that we should apply an hourly rate to determine the reasonable value of his services that would result in an award of $873,839 notwithstanding (as the Hope Law Firm points out) that the Hope Law Firm only received a total net fee of $388,421.02 under the contingent-fee agreement.

As an initial matter, we find no error in the district court's reasoning that Larew should not be paid at an hourly rate that produces a total far exceeding the contingent-fee award. Larew had previously agreed—and should have known as he continued forward after ending the of-counsel agreement—that the basis for any fee in the case would be based on and limited by the 40% attorney contingent fee.

In this case, unlike *Watson* or *Kelly*, we have the benefit of a contingent-fee contract that both Larew and Hope understood would cap the total fee at a

specific percentage of the client's recovery, coupled with the of-counsel agreement specifying the percentages that Larew and the Hope Law Firm would receive of any contingent fee that the firm received. These agreements place this case in a different posture than the situations in either *Watson* or *Kelly*. *Watson* involved a salaried associate attorney's departure, and *Kelly* involved a fee dispute between a law firm and client in which the firm and client had made no agreement about the rate of compensation. We agree with the district court's decision to use the two connected fee agreements as a starting point for calculating Larew's fee.

Accounting for this unique feature in this case, the district court's methodology otherwise applies *Watson*'s basic approach: dividing the fees paid to the firm according to the percentage of time that the lawyer spent on the case before and after the lawyer's relationship with the firm ended. Larew and the Hope Law Firm spent 54.4% of the total hours on the case before the of-counsel agreement ended and 45.6% after. Hope Law Firm's net fee totaled $388,421.02. For the fee division while the of-counsel agreement remained in place, the district court applied the of-counsel agreement's 60/40 split to the net fees, with Larew's 40% (of the 54.4%) coming to $84,520.41. For the fee division after the of-counsel agreement ended through the verdict, the district court determined that Larew was entitled to all of it since, during that period, Larew did all the work. Larew's right to all the remaining 45.6% of the net fees brings his total fee award to $261,640.39.

Larew argues that the net fees (from which the district court's percentages are applied) should be enlarged by the amount paid to Sauro and Bergstrom, who were not involved when Larew worked on the case and, in Larew's view, never should have been hired or paid. But there was never any agreement that Larew would remain lead counsel on the case through appeal, and thus there was no breach of an express or implied contract by Hope's actions presenting the client with the option of retaining Sauro and Bergstrom to handle the post-verdict litigation. Clients, after all, "do not 'belong' to the firm or its individual members; clients are free to choose their own attorney." *Phil Watson, P.C.*, 650 N.W.2d at 565 n.1. Anderson ultimately decided to retain Sauro and Bergstrom, as was her right.

The district court correctly found that the implied-in-fact contract likewise didn't prevent Hope and Wilson from agreeing to carve off a portion of the contingent fee for that work. *Someone* needed to perform that work, both to pursue the post-verdict bad-faith proceedings and to defend the verdict on appeal. The record supports no claim that the parties or the client impliedly agreed that Larew would be paid an hourly rate. Even Larew and Hope's unfruitful negotiations described percentage splits, never an hourly rate basis. In a quantum meruit calculation, the court may consider "the contingent nature of the representation." *Weg & Myers, P.C. v. 126 Mulberry St. Realty Corp.*, 453 F. App'x 90, 92 (2d Cir. 2011) (quoting *Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C.*, 370 F.3d 259, 265 (2d Cir. 2004)). The district court, in determining the terms of the implied-in-fact contract, committed no error in

grounding Larew's fee on a percentage of the client's contingent fee. The district court applied the correct method and used the correct net fee number to calculate Larew's fee, and we thus affirm the district court's calculation of fees owed to Larew.

III.

Larew also appeals the district court's ruling that he failed to show that the Hope Law Firm's new entity, Hope Law Firm & Associates, P.C., was a successor entity to Hope Law Firm, P.L.C., and thus the court's refusal to hold the new entity liable for the judgment.

An entity that purchases the assets of another entity generally doesn't assume liability for the transferring entity's debts and liabilities. *DeLapp v. Xtraman, Inc.*, 417 N.W.2d 219, 220 (Iowa 1987). Exceptions to this general rule apply in four circumstances: (1) the acquirer agrees to take on the liability, (2) the two entities consolidate or merge, (3) the acquirer is a "mere continuation" of the transferring entity, or (4) the transaction amounts to fraud. *Pancratz v. Monsanto Co.*, 547 N.W.2d 198, 200–01 (Iowa 1996). Larew argues that the third (mere continuation) and fourth (fraud) exceptions should apply here.

For a successor entity to be a "mere continuation" of a prior entity, continuity in the business operation isn't enough; we also require "continuity of management and ownership." *Id.* at 201. Larew argues that the new entity satisfies this inquiry, as Hope owns and operates the new entity just as he did the prior one. Larew recites a bevy of other identical features of the two entities— same law practice, same lawyers, same phone numbers, same website, same

location—with the only difference being the slight name change of the entity and incorporation as a P.C. instead of a P.L.C. Larew also recites that the answer to the amended petition even admits that that new entity is the "successor" to the prior one, and that the new entity's payment for a sanction assessed against the prior entity shows the melding of the two entities. As to his fraud allegation, Larew points to the timing of the new entity's creation three days after he filed this lawsuit as evidence that the new entity was formed for the improper purpose of avoiding the payment of the fees owed to him.

Hope responds that our cases generally discuss the "mere continuation" exception in the context of a sale or purchase transaction, and here, no party presented evidence that assets were sold or purchased between the two entities. He further argues that the two entities continue to exist independently of each other and that the new entity made no agreement to assume the debts of the other one. As to the fraud contention, he argues that the district court correctly found that no successor liability should attach because he formed the new entity not to avoid creditors but to take advantage of changes in federal tax laws.

In *C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy., Inc.*, we determined that a martial arts business that a father transferred to his son was a "mere continuation" of a prior one despite lacking identical ownership. 412 N.W.2d 593, 597 (Iowa 1987) (en banc). The prior owner's son incorporated a new entity in which the son served as the sole shareholder, director, and corporate officer. *Id.* at 595. The new entity purchased the other entity's accounts receivable and equipment and then continued the business just as before. *Id.* at

595–96. We noted that "[t]he location of the business, the identity of its employees and instructors, the equipment used to carry out the business, and even the corporation's telephone number remained unchanged after the sale," and the operations continued with "the same lease, the same trade name, the same books, and the same students." *Id.* at 597. We held that the new entity was a mere continuation of the prior one. *Id.* In *Pancratz v. Monsanto Co.*, however, we reflected on our earlier holding in *Chambers* as perhaps better exemplifying the fraud exception than the continuation exception. 547 N.W.2d at 202.

This case presents identical management and ownership in the new entity along with indicia of a continuation such as the same services, employees, phone number, website, and location, evidencing a mere continuation of the prior entity. That there wasn't a formal sale of assets between the entities doesn't change this conclusion. The "key element" in the inquiry—whether there's "a common identity of the officers, directors and stockholders" evidencing the continuation of the prior entity with the new—manifests the continuation of the prior firm under the new one. *Id.* at 201 (quoting *Grand Lab'ys, Inc. v. Midcon Labs of Iowa, Inc.*, 32 F.3d 1277, 1283 (8th Cir. 1994)). Having determined that a "mere continuation" exists in this case, we need not address Larew's related argument under the fraud exception.

We thus reverse the district court's ruling and hold that Hope Law Firm & Associates, P.C., is a successor entity to Hope Law Firm, P.L.C., and liable for the judgment entered in this case.

IV.

Larew next asserts error in the district court's ruling rejecting his conversion claim. To prove a claim for conversion, Larew must establish (1) that his ownership or other possessory right in certain property exceeded the defendants' rights in the property, (2) that one or more of the defendants exercised "dominion or control" over the property inconsistent with his possessory right in it, and (3) that he suffered damages as a result. *In re Est. of Bearbower*, 426 N.W.2d 392, 394 n.1 (Iowa 1988).

Larew's conversion claim comes in two parts. He first contends that the Hope Law Firm, Hope, and Burk converted his property by paying others under the addendum to the contingent-fee agreement (principally, to Sauro and Bergstrom) a portion of the fees that he claims belonged to him. We've already explored and rejected Larew's challenge to the addendum and find no error in the district court's conversion ruling as to this issue.

Larew also contends that the defendants converted his property when Hope placed the contingent fee in the Hope Law Firm's operating account and failed to place the disputed funds in a trust account. Larew argues that Hope knew *some* portion of the fee belonged to Larew and thus that the defendants exercised control over these funds inconsistent with Larew's possessory interest in them.

When the Hope Law Firm received the fee payment at the conclusion of the litigation, Hope placed the funds in the firm's operating account. But Larew requested that Hope segregate the funds and "[i]mpress a trust on" the fees that

the firm received from the litigation. Neither Larew nor Hope ever agreed on where to deposit funds, or how much to deposit, pending the resolution of this dispute. Hope claimed to have deposited between $130,000 and $150,000 in the Hope Law Firm, P.L.C.'s business account that might be used for Larew's eventual payment.

As with the calculation of fees, the of-counsel agreement's termination partway through the case complicates the analysis. The defendants point to a provision in the of-counsel agreement stating that "[a]ll fees and compensation received or realized as a result of the rendition of professional services by the Attorney shall belong to and be paid to *the Firm.*" (Emphasis added.) The defendants acknowledge that Larew has a *contract* right to be paid 40% of the net fees but assert that Larew has no *possessory* right to any particular funds. The defendants compare Larew to a law firm associate attorney having a right to be paid by *the firm* but no right to receive funds from *the client.* They had no legal obligation to place funds received from the Swanny litigation in trust, they argue, because the funds were fees earned by and owed to the Hope Law Firm and thus belong in the firm's operating account.

"Conversion," we have said, "is 'the wrongful control or dominion over another's property contrary to that person's possessory right to the property.' " *Blackford v. Prairie Meadows Racetrack & Casino, Inc.*, 778 N.W.2d 184, 188 (Iowa 2010) (quoting *Whalen v. Connelly*, 621 N.W.2d 681, 687 (Iowa 2000) (en banc)). To prevail on a claim for conversion, "the plaintiff must establish a possessory interest in *the property.*" *Id.* (emphasis added). In *Lee v. Coon Rapids*

*National Bank,* we stated "that there can be no conversion of money having no distinguishing 'earmarks.'" 144 N.W. 630, 634 (Iowa 1913). To the extent that money is the "property" at issue in Larew's claim for conversion, he must point to some specifically identifiable or segregated funds. *See id.*; *see also* 18 Am. Jur. 2d *Conversion* § 7 Westlaw (2d ed. database updated May 2022).

Although Larew argues that the funds should have been held in trust, he doesn't recite any legal or ethical basis for this contention. The district court thus never addressed whether the defendants had any obligation to segregate the fee payment in a trust account and whether such an obligation would give Larew a possessory interest in the fees. None of our cases have yet addressed whether lawyers are required to place fees in a trust account because of a dispute between co-counsel over those fees. Larew, in any event, makes no claim that he acquired a possessory interest in particular funds based on Hope's failure to place the contingent fee in a trust account. Indeed, Larew doesn't actually argue that Hope needed to place the entire contingent fee into a trust account; he states that Hope should have placed in trust "not less than 95% of the amount of the *Swanny* proceeds."

The dissent argues that one of our attorney ethics rules, Iowa Rule of Professional Conduct 32:1.15(a), should be read to provide such a requirement, and then goes on to find a violation of this ethics rule in such a way that it gives Larew a possessory interest in the funds to prove a conversion claim. *See* Iowa R. Prof'l Cond. 32.1.15(a) (requiring lawyers to "hold property of clients or third persons that is in a lawyer's possession in connection with a representation

separate from the lawyer's own property"). But no mention of rule 32:1.15 appears in the parties' briefs, nor was this particular argument addressed by the district court.

Assuming (without deciding) that an argument creating a property interest based on rule 32:1.15 has been preserved, consideration of a different ethics rule, rule 32:1.5, supports the district court's rejection of Larew's conversion claim. That rule restricts lawyers' ability to divide fees on a case when they are not in the same firm. Iowa R. Prof'l Conduct 32:1.5(e). Fees divided among lawyers in different firms must be split "in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation," and the client must "agree[] to the arrangement, including the share each lawyer will receive" with that agreement "confirmed in writing." *Id.*

Larew unquestionably operated as of-counsel within the Hope Law Firm while the of-counsel agreement remained in effect, thus making a separate fee agreement between Larew and the client unnecessary under the rule. Larew and Hope, in other words, were *not* serving under the banners of separate firms but were working on the case as members of one firm: the Hope Law Firm. Plenty of evidence in the record supports this, including the of-counsel agreement itself, Larew's inclusion on the Hope Law Firm's letterhead and website, and the agreement to split fees untied to the actual amount of work that each lawyer would actually perform on the case (e.g., Larew would be doing the lion's share but receiving less than half (40%) of any recovery).

When Larew and Hope ended the of-counsel arrangement, neither one contacted the client to set up a new arrangement that would split their fee between two different *firms*. We must construe an attorney's conduct as consistent (not *in*consistent) with the requirements of our ethics rules unless proved otherwise. Larew and Hope both satisfied the requirements of rule 32:1.5 *if* we find that Larew continued to operate as part of the Hope Law Firm for purposes of their relationship with the client. And again, the only agreement between Larew and Hope about the fee earned was expressed in the of-counsel agreement: "All fees and compensation received or realized as a result of the rendition of professional services by the Attorney shall belong to and be paid to *the Firm*," referring to the Hope Law Firm. (Emphasis added.) There was never any agreement between Larew and Hope, express or implied, to alter their prior arrangement about where the fees would be paid or deposited, and certainly no agreement that would require Hope to segregate the fees in a trust account.

Larew possesses a contractual right to recover his portion of the fees against the firm, as we have declared above. But that doesn't give him a conversion claim. In general, no conversion claim exists where the dispute arises solely out of contractual obligations. *See, e.g.*, *The Cuneo L. Grp., P.C. v. Joseph*, 669 F.Supp.2d 99, 123 (D.D.C. 2009) ("[A] claim for conversion of money may not be maintained to enforce a contractual obligation for payment of money."); *Sullivan v. Thorndike*, 934 A.2d 827, 836 (Conn. App. Ct. 2007) ("A mere obligation to pay money may not be enforced by a conversion action . . . and an action in tort is inappropriate where the basis of the suit is a contract, either

express or implied." (quoting *Macomber v. Travelers Prop. & Cas. Corp.*, 804 A.2d 180, 199 (Conn. 2002)) (omission in original)).

We have stated that "[t]he intentional tort of conversion is the civil counterpart to *theft*." *State v. Roache*, 920 N.W.2d 93, 103 (Iowa 2018) (emphasis added). To tag a lawyer with such a transgression under the blurred state of affairs presented in this case will not do. We thus affirm the district court's ruling rejecting Larew's conversion claims under these facts.

V.

Larew's remaining appeal issues can be addressed based on our resolution of the issues discussed above. He asserts error in the district court's dismissal of tort claims against Hope and Burk in their individual capacities. These tort claims—intentional interference with Larew's relationship with the client resulting in his termination post-verdict, helping the client retain Sauro and Bergstrom and paying them from the contingent fee that reduced Larew's fee, and the conversion of his fee—have been separately addressed and resolved against Larew. Having failed to prove any of his tort claims, Larew likewise fails to prove any tort claims against Hope or Burk individually, including any claim for conspiracy to do these acts. We thus affirm the district court's holding in favor of Hope and Burk on this issue.

Larew also appeals the district court's denial of his claim for punitive damages. Punitive damages are generally not available in a breach of contract action unless a party can show "malice, fraud, or other illegal actions." *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 229 (Iowa 1998). The

district court found no evidence of malice, fraud, or any intentional torts that would warrant an award of punitive damages. Although we have now reversed the district court's ruling that Hope Law Firm and Associates, P.C. serves as a "mere continuation" of Hope Law Firm, P.L.C. (and thus is liable for the judgment entered in this case), we didn't make a finding of fraud, and we otherwise don't find the conduct rises to such a level to show malice. *See Clark-Peterson Co. v. Indep. Ins. Assocs., Ltd.*, 514 N.W.2d 912, 916 (Iowa 1994). We thus reject Larew's claims for punitive damages.

## VI.

The defendants appeal the district court's dismissal of their counterclaim against Larew for intentional interference with the firm's contract with the client. To recover for intentional interference with an existing contract, a plaintiff must prove (1) the existence of a contract with a third party, (2) the defendant knew about the contract, (3) the defendant intentionally and improperly interfered with the contract, (4) the interference caused the third-party not to perform or made performance more burdensome or expensive, and (5) the plaintiff suffered damages. *Kern v. Palmer Coll. Of Chiropractic*, 757 N.W.2d 651, 662 (Iowa 2008). The district court determined that the defendants failed to prove both that Larew improperly interfered with the Hope Law Firm's contract with the client and that the client was rendered unable to perform the contract.

We agree with the district court's determination that no substantial evidence had been presented to establish that Larew intentionally and improperly interfered with the contract. Larew acted within his rights to pursue

litigation to recover fees he earned on the case and, although he was unsuccessful in pursuing an attorney lien in Minnesota, there's no evidence that the lien application was frivolous or otherwise improper. Lack of success in pursuing a legitimate claim isn't improper. We thus affirm the district court's ruling dismissing the defendants' counterclaim.

VII.

For these reasons, we reverse the district court's judgment on the issue of successor liability and remand for an entry of judgment to include Hope Law Firm and Associates, P.C. We affirm the district court's judgment on all other issues.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Appel, McDonald, and Oxley, JJ., join this opinion. Waterman, J., filed an opinion concurring in part and dissenting in part in which Christensen, C.J., and Mansfield, J., joined.

**WATERMAN, Justice (concurring in part and dissenting in part).**

I join the majority opinion except as to part IV and on the issue of the availability of punitive damages. In my view, Iowa Rule of Professional Conduct 32:1.15 required Andrew Hope and his law firm not to take into income—but instead to disburse—funds that were indisputably owed to a separate law firm, James Larew's firm. The breach of that duty could support a conversion claim for which punitive damages are allowed. The district court erred by failing to apply that rule. I would reverse the district court ruling on Larew's conversion and punitive damages claims and remand the case to apply the proper standard.

Rule 32:1.15 fits here like a glove. Our safekeeping property rule provides:

> (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account. . . .

> . . . .

> (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

> (e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

Iowa R. of Prof'l Conduct 32:1.15. The plain meaning of this rule required Hope to keep Larew's funds separate and to distribute any undisputed portion to Larew. Instead, Hope put the funds in the firm's general account without paying Larew. Hope's violation of rule 32:1.15 is evidence that he breached the standard of conduct in Larew's tort claim for conversion. *Stender v. Blessum,* 897 N.W.2d 491, 502–03 (Iowa 2017) ("[A] lawyer's violation of a [disciplinary] rule may be evidence of breach of the applicable standard of conduct." (quoting Iowa R. Prof'l Conduct ch. 32 Preamble & Scope [20])). Rule 32:1.15 helps establish that Larew had more than a mere contract claim against Hope Law Firm (or both Hope Law Firms). Larew actually had a property interest in a specific sum of money that was defeated by Hope's actions.

After noting Larew and the district court never cited rule 32:1.15, the majority contends another disciplinary rule the parties and district court never cited supports rejection of Larew's conversion claim: rule 32:1.5 governing fee-splitting agreements. That rule actually helps Larew. Rule 32:1.5 requires the fee to be split "in proportion to the services performed by each lawyer." Iowa R. Prof'l Conduct 32:1.5(e)(1). Larew tried the Swanny case to the jury and won it with no assistance from Hope. Hope can't rely on that rule to avoid paying Larew's fair share of the fees.

We have already held rule 32:1.15 applies to funds the attorney received that were owed to a nonclient third party. *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Morse,* 887 N.W.2d 131, 139–41, 146 (Iowa 2016) (imposing a thirty-day suspension for violating rule 32:1.15 on funds earmarked for court reporter). We

have never held rule 32:1.15 is inapplicable to fee disputes between lawyers in separate firms. The majority opinion today is limited to the unique facts of this case, where Hope and Larew had been in an of-counsel relationship under the banner of the Hope Law Firm. In my view, because Hope and Larew terminated their of-counsel contract and were practicing in separate firms when the Swanny judgment was collected, rule 32:1.15 applies.

Every court to reach the issue has held this rule applies to fee disputes between co-counsel in separate firms. *See, e.g., People v. Katz*, 58 P.3d 1176, 1180–84, 1189 (Colo. 2002) (holding that an attorney violated Colorado's safekeeping property rule utilizing language very similar to Iowa Rule of Professional Conduct 32:1.15(e) when the attorney failed to keep the disputed funds separate from his own until the fee dispute with co-counsel was resolved); *In re Robinson*, 225 A.3d 402, 406 (D.C. 2020) (explaining that the attorney "violated [the safekeeping property rule] by failing to keep the disputed fees in a trust account pending resolution of the dispute between him and co-counsel"); *Hamilton v. Ky. Bar Ass'n*, 180 S.W.3d 470, 471, 473–74 (Ky. 2005) (holding that an attorney who failed to honor his agreement to pay his former firm a portion of any settlement he obtained from clients he took from the firm violated the safekeeping property rule "by failing to promptly notify a third party claimant [his former law firm] of the receipt of settlement proceeds in which the third party had an interest; failing to promptly deliver to that third party funds that it was entitled to receive; and failing to keep the funds in a separate bank account"); *State ex rel. Okla. Bar Ass'n v. Schlegel*, 808 P.2d 671, 671–72 (Okla. 1991)

(holding the attorney's failure to pay co-counsel pursuant to the fee agreement and converting the funds for his own use by placing the funds in his bank account that was not an attorney trust account violated his duty to keep the property of third persons separate); *In re Jordan*, 809 S.E.2d 409, 418 (S.C. 2017) (per curiam) ("A lawyer holding funds owed to his co-counsel pursuant to a fee-sharing agreement is subject to the requirements of Rule 1.15 as to those funds.").

For example, in *In re Jordan*, the Supreme Court of South Carolina held that an attorney violated South Carolina's safekeeping property rule with language identical to rule 32:1.15 when he deposited fees belonging to co-counsel into his own account instead of paying the fees directly to co-counsel from his trust account. 809 S.E.2d at 418. The Court expressly held that "[a] lawyer holding funds owed to his co-counsel pursuant to a fee-sharing agreement is subject to the requirements of Rule 1.15 as to those funds." *Id.* Therefore, the attorney violated the safekeeping property rule when he failed to keep the funds belonging to his co-counsel separate from his own funds. *Id.* These cases are persuasive.

A formal opinion of the American Bar Association (ABA) reaches the same conclusion that rule 32:1.15(e) applies to disputes between an attorney and co-counsel regarding the division of fees. ABA Comm. on Ethics & Prof'l Resp., Formal Op. 475 (2016). The opinion unequivocally states that "if there is any dispute as to the interest of the receiving lawyer and the lawyer with whom the receiving lawyer is dividing a fee, Rule 1.15(e) requires that the receiving lawyer

keep the disputed funds separate from the lawyer's own property until the dispute is resolved." *Id.* at 3. Our court has relied on ABA formal opinions interpreting the Model Rules when we construe the same language in our disciplinary rules.[1] I would follow this ABA formal opinion that is directly on point and interprets identical language.

Hope can't avoid rule 32:1.15 by arguing Larew was like an associate in the Hope Law Firm. For one thing, by the time the funds were paid to Hope, the parties had already terminated the of-counsel agreement and clearly were in separate firms. Even while the of-counsel agreement was in effect, Larew was never an employee of Hope Law Firm, and his compensation was specific to each case on which the parties worked together and based only on the receipts for that case. Moreover, the majority can't consistently say that Hope and Larew had an ethical duty to inform the client of their fee-splitting arrangement and then maintain elsewhere in the opinion that Hope and Larew were part of the same firm.

Hope offered no valid reason for failing to keep the disputed funds separate as required by the rule. Hope admitted Larew was entitled to $130,000 to $150,000. Instead of promptly paying Larew what he owed as required by

---

[1]*See, e.g., Iowa Sup. Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 768–69 (Iowa 2010) (interpreting Iowa Rule of Professional Conduct 32:8.4(d) to align with the ABA's interpretation because "hold[ing] otherwise would be contrary to the intent of the ABA's Model Rules of Professional Conduct when it proposed the model rule, which we adopted in rule 32:8.4(d) without change"); *see also Iowa Sup. Ct. Att'y Disciplinary Bd. v. Moothart*, 860 N.W.2d 598, 606 (Iowa 2015) (quoting an ABA formal opinion with approval); *Iowa Sup. Ct. Att'y Disciplinary Bd. v. Morrison*, 727 N.W.2d 115, 118 (Iowa 2007) (same); *Sorci v. Iowa Dist. Ct. for Polk Cnty.*, 671 N.W.2d 482, 492 (Iowa 2003) (same); *see also Iowa Sup. Ct. Bd. of Pro. Ethics & Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998) (quoting an ABA informal opinion with approval).

rule 32:1.15(d), or escrowing the disputed funds until the dispute was resolved as required under rule 32:1.15(e), Hope wrongfully diverted and then retained Larew's share in the firm's general account.

Rule 32:1.15 effectively provides Larew with a security interest in his share of the funds recovered in the lawsuit. Hope can't avoid conversion liability by commingling the lawsuit proceeds in his general account to argue the money is no longer identifiable. We can follow the money to which Larew's interest attached under rule 32:1.15. *MidwestOne Bank v. Heartland Co-op*, 941 N.W.2d 876, 883 (Iowa 2020) (recognizing bank's conversion claim in proceeds of sale of grain based on security interest in crops); *Linn Coop. Oil Co. v. Nw. Bank Marion, N.A.*, 444 N.W.2d 497, 498–99 (Iowa 1989) (affirming judgment for conversion of proceeds from sale of grain in which plaintiff had security interest).

Iowa law punishes and deters the wrongful diversion of money through a tort remedy for conversion and punitive damages. *See Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593–94 (Iowa 1999) (affirming judgment for conversion of funds and punitive damages); *see also Berger & Montague, P.C. v. Scott & Scott, LLC*, 153 F. Supp. 2d 750, 753–54 (E.D. Pa. 2001) (allowing conversion claim in fee dispute because "once a fee has been received, the referral fee can be the subject of conversion" (quoting *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 879 (Pa. Super. Ct. 1997))); *Broussard, Bolton, Halcomb & Vizzier v. Williams*, 796 So. 2d 791, 795–96 (La. Ct. App. 2001) (affirming judgment for conversion when defendant attorney unilaterally withdrew disputed attorney fees owed prior attorney from settlement

proceeds); *Elkins v. Benner,* No. 331701, 2017 WL 4518897, *5–7 (Mich. Ct. App. Oct. 10, 2017) (per curiam) (reinstating attorney's conversion claim based, in part, on Disciplinary rule 1.15(b) and holding that "once a fee has been received, the referral fee can be the subject of a conversion," and "the attorney's law firm can be vicariously liable for conversion"); *Bernhardt,* 705 A.2d at 879 (remanding for assessment of punitive damages for conversion in connection with a fee dispute between lawyers). *But see Sutherland v. O'Malley*, 882 F.2d 1196, 1200–01 (7th Cir. 1989) (affirming summary judgment dismissing attorney's conversion claim in fee dispute with co-counsel because, under Illinois law, "a defendant wrongfully depriving a plaintiff of an indeterminate sum of money is liable for a debt rather than a conversion").

While the caselaw in other jurisdictions may be mixed, Iowa law allows a conversion claim and punitive damages when identifiable money in which a party has a property interest is wrongfully diverted. *Crick,* 604 N.W.2d at 593–94. Larew is entitled to his day in court on his conversion claim and claim for punitive damages against Andrew Hope, individually, and his law firm for at least the $130,000 Larew indisputably was owed.

For these reasons, I respectfully dissent from part IV of the majority opinion and on the issue of the availability of punitive damages.

Christensen, C.J., and Mansfield, J., join this concurrence in part and dissent in part.